779 So.2d 1225 (1999)
Robert Shawn INGRAM
v.
STATE.
CR-94-1733.
Court of Criminal Appeals of Alabama.
August 27, 1999.
Rehearing Denied October 29, 1999.
*1237 Jeb Stuart Fannin, Talladega; and Mark Smith Nelson, Talladega, for appellant.
Bill Pryor, atty. gen., and Beth Jackson Hughes, asst. atty. gen., for appellee.
PATTERSON, Retired Appellate Judge.
The appellant, Robert Shawn Ingram, was indicted by the Talladega County grand jury on June 28, 1994, in a two-count indictment. Count one of that indictment charged the capital offense of murder committed during a kidnapping in the first degree, or an attempt thereof, see Ala.Code 1975, § 13A-5-40(a)(1), and count two charged the offense of murder, a violation of § 13A-6-2. The indictment reads, in pertinent part, as follows:
"COUNT ONE:
"That the Grand Jury of said County charge that ... Robert Shawn Ingram... did intentionally cause the death of Gregory Huguley by burning him, and Robert Shawn Ingram caused said death during Robert Shawn Ingram's abduction of, or attempt to abduct, Gregory Huguley with intent to inflict physical injury upon him, or to terrorize him, in violation of § 13A-5-40(a)(1) of the Code of Alabama, 1975....
"COUNT TWO:
"That the Grand Jury of said County charge that ... on or about the 31st day of July 1993, in the County of Talladega, Alabama, Robert Shawn Ingram ... did intentionally cause the death of another person, to-wit: Gregory Huguley, by burning him, in violation of § 13A-6-2 of the Code of Alabama, 1975....
At arraignment, Ingram pleaded not guilty. At the conclusion of the presentation of evidence in the guilt phase of the trial, the trial court dismissed count two of the indictment on motion of the state. On May 18, 1995, a jury found Ingram guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury, in accordance with §§ 13A-5-45 and -46, and the jury recommended by a vote of 11 to 1 that the sentence should be death.[1] Thereafter the trial court held another sentencing hearing in accordance with §§ 13A-5-47 through -52, and after weighing the aggravating circumstances and the mitigating circumstances, considering *1238 the jury's recommendation, and considering the presentence investigation report, sentenced Ingram to death.[2] Ingram appeals his conviction and sentence, raising 24 issues. We will address those issues in the order they appear in Ingram's brief. We have also searched the record for plain error as required by Ala.R.App.P. 45A.[3]
The state's evidence showed the following: On July 31, 1993, Ingram, along with Anthony Boyd,[4] Moneek Marcell Ackles,[5] and Dwinaune Quintay Cox,[6] kidnapped Gregory Huguley, by force and at gunpoint, from a public street in Anniston, took him to a ballpark in a rural area of Talladega County, and, while he was pleading for his life, taped him to a bench, doused him with gasoline, set him on fire, and burned him to death. The state's evidence showed that Ingram was a principal actor in the murder, wielding the gun and using force to effect the kidnapping, pouring the gasoline on Huguley, and lighting the gasoline with a match. The evidence also shows that Huguley was abducted and killed because he failed to pay $200 for crack cocaine sold to him several days before the murder. The record further shows that after Huguley had been set on fire, the conspirators stood around for approximately 20 minutes and watched him burn to death. For a more detailed recitation of the facts of this case, see Boyd v. State, 715 So.2d 825 (Ala.Cr.App. 1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
Ingram did not testify at either the guilt phase or the sentencing phase before the jury. He offered no evidence in his defense at the guilt phase. At the sentencing phase before the jury, he called eight witnesses, seven of whom were relatives who offered mitigation testimony about Ingram's family life and background and who asked the court to spare his life. At the sentencing phase before the trial judge, he called no witnesses and presented no evidence; however, when asked if he had anything to say before he was sentenced, he stated: "Well, I still be ask that my life be spared. I have a daughter that I've really never got to seen, and she just turned one last Sunday; and maybe some *1239 day in the future I hope to be with her and the rest of my family." (R. 1052.)
We note at the outset that Ingram does not question the sufficiency of the evidence to support his conviction. Nevertheless, we have reviewed the record as to sufficiency, as we are required to do in a death case, and we find that the evidence presented by the state was sufficient for the jury to find him guilty beyond a reasonable doubt of the capital offense charged in the indictment. In the trial court's order setting out the facts summarizing the crime and addressing Ingram's participation in it, the court stated, "The evidence introduced in the four-day trial, both direct and circumstantial evidence, overwhelmingly supported the jury's verdict." We agree.

I.

A.
Ingram contends that the "trial court's penalty phase charge was fatally flawed" because, he says, it allowed the jury to consider aggravating circumstances that were inapplicable to his case. (Appellant's brief, p. 1.) He argues that the instructions deprived him of the reliability required in capital sentencing, and that he is therefore entitled to a new sentencing hearing. He further argues that the instructions were made "especially bad" because they followed a recitation by the district attorney of all eight statutory aggravating circumstances and a discussion of whether each applied to Ingram.
Ingram did not object to the trial court's instructions to the jury on aggravating circumstances. Thus, we review this contention under the plain-error rule.
A review of the trial court's instructions reflects that it charged the jury that the jury could consider two statutory aggravating circumstances in the case, i.e., that the capital offense was committed while the defendant was engaged in or was an accomplice in the commission of a kidnapping, and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. While the trial court mentioned that there were eight statutory aggravating circumstances, it did not tell the jury what the other six were. The trial court instructed the jury, in pertinent part, as follows:
"On the list of aggravating circumstances provided by law there are two circumstances that you may consider in this case if you are convinced beyond a reasonable doubt and to a moral certainty based on the evidence that each circumstance does exist. The fact that I instruct you on these aggravating circumstances or define them for you does not mean that these aggravating circumstances have been proven beyond a reasonable doubt in this manner."
(R. 1031.)
"The first aggravating circumstance which you may consider in this case is number four on that list of eight that I just mentioned to you, and that is the aggravating circumstance that says that the capital offense was committed while the defendant was engaged in or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit rape, robbery, burglary, or kidnapping, and in this case we will be talking about kidnapping.
"As to this aggravating circumstance, the Court instructs you that this circumstance has been proved by your verdict in the trial stage. And I will explain that further to you and cite a Code section to you in this regard later on in my charge.
"Now the other aggravating circumstance you may consider is number eight on that list of eight, and that is that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses."
(R. 1031-32.)
"You may not consider any aggravating circumstances other than the aggravating *1240 circumstances for which I have instructed you."
(R. 1035.)
While it is true that the district attorney listed all eight of the statutory aggravating circumstances in his opening statement during the penalty phase of the trial before the jury, he clearly informed the jury that the state was relying on only two aggravating circumstances, i.e., the two mentioned above. Also, the district attorney in his closing argument to the jury emphasized again that the state was relying on two aggravating circumstances, i.e., that the murder was committed by the defendant during a kidnapping in the first degree, and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. § 13A-5-49(4) and (8).
After reviewing the instructions we find, contrary to Ingram's contentions, that they were proper and that they were not misleading. The jury was clearly instructed as to the two aggravating circumstances it could consider and was further instructed that it could not consider any others. It is unreasonable to conclude, as Ingram suggest's, that the jury was misled by these instructions. We find no error in the instructions, much less plain error.

B.
Ingram also contends that the trial court's jury instructions on aggravating circumstances were "overbroad" and allowed the jury to consider inapplicable or nonstatutory aggravating circumstances. We find no merit in this contention. The cases relied upon by Ingram to support this contention are factually distinguishable from this case. We find no error here, and certainly no plain error.

II.
Ingram contends that the trial court erred when it granted the state's motion to dismiss count two of the indictment. He argues that the dismissal of count two, without his consent, constituted an unauthorized amendment of the indictment. Initially, a two-count indictment was returned by the grand jury, charging Ingram in count one with the capital offense of the murder of Gregory Huguley committed during a kidnapping in the first degree, § 13A-5-40(a)(1), and in count two with the intentional murder of Huguley, § 13A-6-2. After both sides had completed their presentation of evidence in the guilt phase and had rested, the state moved for the dismissal of count two. The motion was granted by the trial court, over Ingram's objection. There was no error in this ruling. "Withdrawing a part of a charge from an indictment does not constitute an amendment thereof, provided nothing is added to the indictment." Nerud v. City of Mountain Brook, 517 So.2d 652, 653 (Ala.Crim.App.1987). What occurred here was nothing more than a nolle prosequi or an election by the district attorney to discontinue prosecution of a count in the indictment. The district attorney was competent, with the consent of the court, to enter a nolle prosequi or to discontinue prosecution of the count in the indictment. See Jackson v. State, 21 Ala.App. 284, 107 So. 725 (1926); Murphy v. State, 399 So.2d 340 (Ala.Crim.App.1981); Morrison v. State, 398 So.2d 730 (Ala.Crim.App.), rev'd on other ground, 398 So.2d 751 (Ala.), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). See generally 22A C.J.S., Criminal Law §§ 229 and 424 (1989).
The trial court instructed the jury that it could consider intentional murder as a lesser included offense of capital murder as charged in count one of the indictment. In granting the state's motion to dismiss count two, the trial court stated:
"I'm going to allow the state to dismiss count two, and the reason for that is that the court is bound to instruct the jury that intentional murder is a lesser included charge of capital murder, and if I were to give it, explaining it to them againthat would be redundant and *1241 wouldn't be necessary. I'm going to go into great details and explain that to them. The court can see no prejudice to the defendant relative to this."
Moreover, the dismissal of count two was proper because the principles of double jeopardy would have been violated if Ingram had been convicted of intentional murder under count two and also convicted of the capital offense of murder committed during a kidnapping under count one. Double jeopardy is violated by a defendant's conviction for intentional murder under one count of an indictment and capital murder under another count where the same murder was an element of both offenses. Borden v. State, 711 So.2d 498 (Ala.Crim.App.1997), aff'd, 711 So.2d 506 (Ala.), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Furthermore, the failure to dismiss one of the counts would have violated Code of Ala.1975, § 13A-1-8(b). Section 13A-1-8(b) provides, in part, as follows:
"When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"(1) One offense is included in the other as defined in § 13A-1-9...."
Clearly, under § 13A-1-9, murder is included in the capital offense of murder during a kidnapping. Coral v. State, 628 So.2d at 958.
We note that the record shows that before Ingram was indicted, he had entered into a written agreement with the state whereby he agreed to cooperate with the state by giving a true statement of what happened and by testifying against his codefendants. In return, he would be allowed to plead guilty to murder and the state would recommend a sentence of life imprisonment. He subsequently refused to testify against his codefendants, and the state withdrew the agreement. It is obvious that the murder count was included in the indictment as a result of that agreement. (R. 61-72.)

III.
Ingram contends that his constitutional rights were violated by the trial court's admission of testimony about his alleged involvement in drugs. He argues that the admission of testimony of his involvement in drugs constituted reversible error and violated a basic rule that evidence of collateral offenses not charged in the indictment and having no connection therewith is inadmissible. The state argues that the testimony was admissible as an exception to the general exclusionary rule because, it says, the evidence had probative value on the issue of motive. Ingram specifically refers to the testimony of three state witnesses who testified about his drug activities as they related to this case. Ingram did not object at trial to the admission of this testimony from these witnesses on the ground now asserted on appeal. Thus, we review this issue under the plain-error standard. Rule 45A, Ala. R.App.P.
Sabrina Mask testified on direct examination that she knew Ingram, Boyd, Ackles, Cox, and the victim Huguley; that Ackles was her cousin; and that about three weeks before Huguley's death, she had had a conversation with Ingram, Boyd, and Ackles concerning Huguley. She testified that they asked her if she had seen Huguley, and in response to her question as to why they were looking for him, they stated that he had taken "dope" from them. She further testified that they made statements that "He's done fucked up" and "We'll get his ass." On cross-examination by Ingram's counsel, she testified that Huguley "dealt" in drugs and that an amount of $200 had been mentioned in the conversation.
Lewis Butts testified on direct examination that about a week and a half before *1242 Huguley's death, he heard a conversation between Ingram, Ackles, and Boyd in which they were discussing Huguley. He testified that he heard Boyd say that Huguley owed them $200 and that "they had to get him." He also testified that he knew Huguley to be a big drug user.
Julie Williams, Ingram's girlfriend, testified about a conversation she had with Ingram shortly after Huguley's death, in which he told her about participating in the kidnapping and murder of Huguley. The record shows the following:
"Q. [Prosecutor:] ... Then if you would, tell the ladies and gentlemen of the jury what he told you and what you said.
"A. [Williams:] He told me that first of all he said that he didn't think we should be together anymore because he had changed for the worst and I deserved better. He said he had done something real bad and I asked what. He told me that him, Marcel [Ackles] and Anthony [Boyd] were on 15th Street, picked up this guy, put him in the van, took him to Mumford, tied him to a bench and poured gasoline on him and set him on fire.
"Q. Did he tell you that the guy had messed him up over some money?
"A. Yes.
"Q. Did you ask him why he did it?
"A. Yes. He said it was business and I said what kind of business. He just kept saying business, but I knew what kind of business it was."
(R. 690-91.)
"A. [Williams:] I said what could he have possibly done to you to burn him. He said it was business, just business. I said, `What kind of business?' and he said, `It's just money. He owed me money,' and he said, `He owed us some money.' I was asking questions like what was the guy saying. He just kept sayingthe guy was saying, `Please don't hurt me. Please don't hurt me.' And then ... the guy said, `I'm sorry for what happened.'
"Q. Did he also tell you that the guy was crying as he was saying `Please don't hurt me'?
"A. Yes. He said he was begging for his life."
(R. 708-09.)
Codefendant Cox, testifying for the state, testified that as Huguley was being pulled or pushed into the van by Ingram at gunpoint, he stated several times, "I'll have your money later on." (R. 738) and that after he was in the van he said two or three times, "I'll have your money. Please don't kill me." (R. 739.) On cross-examination he testified that he [Cox] occasionally sold drugs.
While the general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which an accused is being tried, Twilley v. State, 472 So.2d 1130, 1134 (Ala.Crim.App.1985), if an accused's commission of another crime or misdeed is an element of guilt, or otherwise tends to prove his guilt, then proof of such other crimes or misdeeds is admissible. Twilley v. State; Cheatham v. State, 431 So.2d 1350 (Ala.Crim.App.1983); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (4th ed.1991).
This court has recognized several welldefined exceptions that allow evidence of other crimes to be presented during trial; one of those is motive.
In McElroy at § 70.01(12), we read:
"(a) General exclusionary rule applicable in homicide.
"The general rule which excludes evidence of prior and subsequent crimes, when their only probative value is to show in the defendant a tendency or disposition to commit the now-charged crime, is applicable when the accused is *1243 being prosecuted for homicide. If the evidence of other criminal acts does not fall within one of the exceptions to this general exclusionary rule then it is not to be admitted.
". . . .
"(e) Motive.
"Another of the primary exceptions to the general rule excluding evidence of other crimes is the principle that other crimes are admissible if they have probative value upon the issue of motive for the now-charged crime. The motive element of a homicide may take many forms. For example, it may involve malice, ill-will for the victim or it may include the purpose of the homicide.... Whenever a prior or subsequent crime is relevant to prove the motive for the now-charged homicide, it is admissible."
(Footnotes omitted.)
"The basis for the evidentiary rule excluding evidence of the accused's commission of crimes not charged in the indictment `lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them.' McElroy at § 69.01(1). Consequently, not only must it be determined that the other offenses are material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice.
"`Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.' United States v. Turquitt, 557 F.2d 464, 468-69 (5th Cir.1977) (citations omitted).
"However, it is `only when the probative value of evidence is "substantially outweighed by the danger of unfair prejudice," ... that relevant evidence should be excluded.' United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir. 1982) (emphasis in original). `[T]he probative value of the evidence of other offenses must also be balanced against its "prejudicial nature" to determine its admissibility. "Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.' State v. Daigle, 440 So.2d 230, 235 (La.Ct.App.1983).
"`Of course, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." State v. Hurd, Me., 360 A.2d 525, 527 n. 5 (1976), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n. 31 (2nd ed.1972).' State v. Forbes, 445 A.2d 8, 12 (Me.1982)."
Averette v. State, 469 So.2d 1371, 1373-74 (Ala.Crim.App.1985).
The evidence that drugs were involved in the commission of the crime in this case is undisputed. We find that a reasonable trier of fact would conclude from this evidence that Ingram and his accomplices, along with Huguley, were dealing in illegal drugs, and that Ingram, Boyd, and Ackles kidnapped Huguley and murdered him because he owed them $200 for drugs. We are of the opinion that such evidence tended to show the motive, i.e., ill will toward the victim and the purpose for the commission *1244 of the crime, and was therefore admissible. The evidence in question was material, relevant, and reasonably necessary to the state's case, it fell clearly within an exception to the exclusionary rule, and its probative value was not outweighed by undue prejudice. See, Smith v. State, 585 So.2d 223 (Ala.Crim.App.1991), a case with identical facts relating to this issue in which we held that evidence that the victim was killed because he owed Smith money for cocaine was admissible to show motive. See also our opinion in codefendant Boyd's case, Boyd v. State, in which we addressed this same issue under substantially the same facts, and held that the evidence showing that Huguley was kidnapped and murdered because he owed Boyd, Ackles, and Ingram $200 for drugs was admissible to show motive.

IV.
Ingram contends that the trial court erred in sentencing him by failing to find and consider the existence of the statutory mitigating circumstance of his age at the time of the commission of the crime, § 13A-5-51(7), and by failing to find and consider any nonstatutory mitigating circumstances, § 13A-5-52.
He argues that the trial court did not find age to be a mitigating circumstance because it incorrectly believed he was 24 at the time of the commission of the crime when in fact he was 22. He argues that if the trial court had known his correct age at the time of the crime, it might have found an additional mitigating factor that could have affected both its weighing of the aggravating and mitigating circumstances and its determination of his sentence. It is true the trial court did not find Ingram's age to be a statutory mitigating circumstance; it found only one statutory mitigating circumstancethat Ingram had no significant history of prior criminal activity. In its sentencing order, the trial court calculated that Ingram was 24 years of age at the time of the crime. The presentence report in the record shows Ingram's date of birth the be March 8, 1971. The record shows that the crime was committed on July 31, 1993. Thus, to be exact, he was 22 years, 4 months, and 23 days of age on the date the crime was committed and 24 years, 5 months, and 14 days of age at the time of sentencing, a difference of approximately 2 years and 21 days. The record shows that the trial court considered the presentence report in arriving at its sentence. The record also shows that just before sentencing on June 16, 1995, the trial court asked Ingram, "How old are you now?" Ingram responded, "Twenty-four." (R. 1051-52.) The state suggests that the finding could have been a typographical or clerical error, and if not, because of Ingram's obvious maturity at the time the crime was committed, it would have made no reasonable difference to the trial court, even if the finding had been that he was 22 years of age. In other words, the state maintains that whether he was 24 or 22 would have made no difference in the trial court's findings in this case. In support of its argument, the state correctly points out that before committing the crime, Ingram had fathered a child, had embarked on a career as a drug dealer, and was no longer a youth but was "living out in the world." We note from the record that although unmarried, Ingram was the father of a one-year-old child, had spent much of his life in Brooklyn, New York, had dropped out of school when he was 10 years of age, was obviously dealing in drugs, was worldly and streetwise, and was sui juris and legally responsible for his acts. We agree with the state that whether Ingram was 24 or 22 when he committed this crime, his age had no reasonable bearing upon its commission. We think that under the facts presented, even if the trial court's finding had been that Ingram was 22 at the time he committed the crime, its ruling would have been the same. We are inclined to agree with the state that the sentencing order showing that Ingram was 24 at the time of the crime was a mistake or an unintended entry, in view of the fact that *1245 the trial court specifically asked Ingram when he was sentenced how old he was and Ingram stated that he was 24. The court obviously would have known from the trial that it had been over two years since the crime had been committed.
Ingram did not object in the trial court to this finding; therefore, this issue is reviewable only under the plain-error standard. After reviewing all of the circumstances here, we find that even if the trial court miscalculated Ingram's age in its findings at the sentencing hearing, the miscalculation did not rise to the level of plain error. See the companion case of Boyd v. State, and the case of Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), where the Alabama Supreme Court addressed this identical issue with substantially the same facts and concluded that the trial courts' miscalculations did not constitute plain error.
Ingram contends that the trial court improperly failed to find the existence of any nonstatutory mitigating circumstances. He argues that he presented the testimony of his family and friends at the sentencing hearing before the jury, which testimony, he asserts, was "unquestionably mitigating." We have reviewed the record in this regard. It shows that he called eight witnesses to testify at his sentencing hearing before the judge and jury in an effort to establish mitigating circumstances.
His brother, Calvin Lavon Ingram, testified that he was nice and fun loving, that he cared about and got along with children, and that he could be a positive influence on the children. Felicia Stewart, a friend who had known him about 14 years, testified that he was quiet, never hostile, obeyed his mother, played basketball, got along well with the younger children, and never engaged in fights. Ms. Willie P. Taylor, his stepsister, stated that he was a good person, got along well with the children, and could have a positive influence on others. Mary Jones, a cousin, testified that she had known him all of his life, that he was close to her son, always had a positive attitude, was shy and kept to himself, and that he encouraged her son to stay out of trouble, get an education, and go to college. Anthony Parker, his brother-in-law, testified that he was the kind of person that would help you with problems, that he liked children and would play with them, and that Ingram had been a positive influence on Parker's life. Joyce Elston, his aunt, testified that occasionally during his life he had lived in her home, that he was real quiet, athletic, made good grades in school, and was a good influence on her children. Carla Parker, his sister, testified that he was a good, respectful young man, that when he was growing up he minded his mother and did everything he was supposed to do, that he had a young daughter and he was a good daddy, that he was athletic, made good grades in school, and was easy to get along with, that he had been an inspiration to her and her daughter and had helped them, and that he could be a positive influence on others if allowed to live. His mother, Dorothy Ackles, being ill and unable to attend court, testified by video deposition. She stated that he had two brothers and one sister, that he was her youngest child, that he was excellent in school, and made A's, B's, and C's, that he was involved in sports and had many trophies and ribbons, that he had a little girl who was one year of age, that he was quiet and obedient, that he liked to work with children, that when he lived in New York he had summer jobs, and that when very young he had medical problems with his legs, but that those problems had been corrected. All of the witnesses asked that he be given a life sentence and that his life be spared. As we have previously mentioned, Ingram made a statement before the judge at sentencing, asking that his life be spared so he could be with his child and his family.
Ingram failed to object in the trial court to that court's sentencing order concerning its consideration and findings in reference *1246 to mitigating circumstances. Thus, we must review this issue under the plain-error rule.
"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors." Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to present any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala. 1992); Haney v. State, 603 So.2d 368 (Ala. Cr.App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Williams v. State, 710 So.2d 1276 (Ala.Crim.App., 1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr. App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987); Williams v. State.
We conclude, contrary to Ingram's contentions, that the trial court considered all evidence offered by Ingram in mitigation and did not restrict him in any manner in his presentation of mitigating evidence. The record clearly supports this conclusion. As to nonstatutory mitigating circumstances, the trial court found:
"The Court has made a diligent search under the provisions of Section 13A-5-52, the evidence offered by [Ingram], and aspects of the presentence report favorable to [Ingram] on mitigation to determine if there is any aspect of [Ingram's] character or record or any circumstances of the offense for which he has been convicted that would constitute a mitigating circumstance and finds that there is one mitigating circumstance as set out above [the statutory mitigating circumstance that [Ingram] had no significant history of prior criminal activity], but finds no other statutory or nonstatutory [mitigating circumstance?]"
(C.R.55.)
The trial court in its sentencing order specifically referred to Ingram's evidence offered in mitigation, as follows:
"[Ingram] offered evidence of mitigating circumstances as provided in Section 13A-5-52 from his family members, Dorothy Ackles, his mother, and other family members Kelvin Ingram, Felicia Stewart, Willie P. Taylor, Mary Jones, Anthony Parker, Joyce Elston and Glenda Parker."
(C.R.50.)
The trial court's sentencing order clearly shows that it considered all relevant statutory and nonstatutory mitigating evidence. Thus, we find no merit in Ingram's contention that the trial court failed to consider his evidence of nonstatutory mitigating circumstances. Although the trial court is required to consider all mitigating circumstances, and in this case it obviously did, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the trial court. The fact that the trial court did not list and make findings in its sentencing order as to the alleged nonstatutory mitigating *1247 circumstances offered by Ingram indicates only that it found some evidence not to be mitigating, not that the evidence was not considered. After reviewing the evidence presented in mitigation and the findings of the trial court in reference to it, we conclude that the findings are amply supported by the record, and that no error was committed by the trial court in reference to them. Ingram's contentions concerning the trial court's findings and consideration in reference to the mitigating circumstances certainly do not rise to the level of plain error.

V.
Ingram contends that he was convicted on the basis of irrelevant, inflammatory, and extraneous evidence. He argues that the admission of such alleged irrelevant and inflammatory evidence and the improper arguments based on it effectively denied his constitutional rights.
In support of his contention, he refers to the testimony of Larry Hughes, a state serologist, who testified that he examined the van alleged to have been used in the kidnapping for bloodstains; that he found a stain on the step plate of the van on the driver's side and that he could not confirm that it was blood; and that he also found a stain on the rear seat of the van that he determined to be human blood, but he could not match it to anyone. He testified that it could not have originated from the victim, Huguley. No objection was raised to this testimony, and Ingram's counsel cross-examined the witness extensively about the stains and the witness's findings, emphasizing that the bloodstain could not be connected with anyone involved in the case, particularly Ingram.
In closing argument in the guilt phase, the prosecutor mentioned this testimony, saying:
"Now there was some testimony about a bloodstain in the van. Again, that is just something we wanted to show you. We didn't want to hold anything back, just to show you the work that was done in this case.
". . . .
"... [T]hat's not Greg Huguley's blood on that seat cover. That tells us through DNA, it's not Greg Huguley's blood. It tells us that it ain't got one thing to do with this case. But you know, when you are proving to each and everyone of you beyond a reasonable doubt and to a moral certainty it's real interesting that you don't hear a single question why didn't they investigate or do this. Why didn't the State do this? Why didn't they do that? If they'd done that, we'd known. Well, see they are not asking those questions because every single thing that could be done was done."
(R. 851 and R. 892-93.)
In support of his contention, Ingram also refers to testimony pertaining to fingerprints. Dennis Surrett, a state investigator, testified that he examined several items collected at the scene of the crime, which included beer and soft drink cans, for latent fingerprints; that he lifted several and forwarded them along with the known prints of Ingram, his accomplices, and the victim to Marietta Prevost, a state fingerprint examiner. Prevost testified that she found useable fingerprints on only two cans and that they were not the fingerprints of Ingram or his accomplices, but were the fingerprints of the victim, Huguley. No objection was raised to this testimony. Obviously, to emphasize that Ingram's fingerprints were not found on anything at the crime scene, on cross-examination defense counsel asked, "[W]ere Shawn Ingram's prints found at the scene of the crime ... ?" Prevost answered, "No, sir." Counsel asked further, "His prints were not on anything that you received?" Prevost answered, "That's correct." (R. 497.) In closing argument in the guilt phase, the prosecutor, without objection, addressed the fingerprint testimony as follows:

*1248 "In fact, some of the cans that were picked up, they were fingerprinted, but no useful fingerprints or no fingerprints that matched any of the defendants were found. We just wanted to show you the work that was done in this case and not hold anything back from you."
(R. 850-51.)
Ingram's counsel also addressed the fingerprint testimony in closing argument, as follows:
"Now the State put on a lot of evidence about fingerprints and things they picked up at the scene. Beer cans and bottles and [a] gas cap or what purported to be a gas cap, a red cap in a mason jar. They tried to get some prints, and they couldn't get any prints of value; and I'd ask you to recall when I ask[ed] the fingerprint expert, Mrs. Marietta Prevost, did she have any identifiable prints of Shawn Ingram, and she said, `No.' Think about that. His prints are not on anything."
(R. 866.)
Ingram contends that the state relied on a gun, which was misleading, never alleged to have been used in the commission of the crime, and "continually paraded ... before witnesses." (Appellant's brief, p. 19.) The record shows that the gun used in the kidnapping was a 9mm Mack 11; that it belonged to Cox and was in the van; that Ingram "grabbed" the gun just before the kidnapping began; that he used the gun to force Huguley into the van; and that he returned the gun to Cox the next day. Cox later sold the gun. Apparently, the actual gun used in the commission of the crime was never recovered; however, it appears from the record that a similar gun, that was never offered or admitted into evidence, was lying on the counsel table near where Mike McBurnett, a state investigator, was sitting, and that this gun was referred to during the examination and cross-examination of witnesses. Again, no objection was made on the grounds now asserted to any of the testimony about the gun. On direct examination of Cox, the record shows the following:
"Q. [Prosecutor:] Now I'm not saying that this is the gun, but does this look like the gun you had? [Apparently pointing to the gun on the counsel table.]
"A. [Cox:] Yes.
"Q. What kind of gun was it?
"A. M-11, Mack 11.
". . . .
"Q. And this gun here looks like the gun you would have had at the time?
"A. Yes."
(R. 729.)
Ingram's counsel cross-examined the witnesses extensively about the gun. Cox was asked on cross-examination:
"Q. [Defense counsel:] What happened then?
"A. [Cox:] Shawn [Ingram] spotted New York [Huguley]. Shawn got out of the van with my gun and told New York to come here.
"Q. You had a Mack 11?
"A. Right."
(R. 768.)
"Q. And you say Shawn had a gun?
"A. Right.
"Q. Which gun was it?
"A. My Mack 11.
"Q. That gun on the table there by Mr. McBurnett, Investigator McBurnett, like the gun you had?
"A. All except for the little hammer on the end.
"Q. All right. Same gun more or less?
"A. More or less.
"Q. All right. You had another gun besides that didn't you?
"A. No."
(R. 776.)
Ingram also contends that error occurred when the trial court allowed expert witnesses to testify for the state as to matters not in evidence and beyond their *1249 experience. Although he does not identify the experts in his brief, he apparently is referring to the testimony of Dr. Joseph Embry, the state medical examiner and pathologist; Dennis Surrett, the state investigator who lifted the latent fingerprints from the items recovered at the scene of the crime; and John Case, the state trace evidence expert. We note again that no objection was raised in the trial court to the testimony of these expert witnesses. On the contrary, Ingram stipulated that Embry and Case were qualified to testify as experts in their fields, and as to Surrett, stated that he had no objection to him testifying as a fingerprint expert. As to Embry and Case, he apparently objects to their testimony that the victim had been bound by some type of tape. Embry testified on direct examination, without objection, that it appeared that the victim had the remains of burned tape over his mouth and on his right forearm near the wrist. On cross-examination, Ingram's counsel brought out Embry's findings about the tape in great detail. The record shows the following:
"Q. [Defense counsel:] There's a sentence in here [apparently referring to a report], `White discoloration is in the cheeks consistent with burned tape, approximately two inches in width.'
"A. [Dr. Embry:] Yes, sir.
"Q. Tell the jury what you meant by that, by `consistent with.'
"A. Well, it had burned to the point where it had melted.
"Q. Were you able to identify that positively as tape?
"A. That's what it appeared to be to me.
"Q. Is it possible it was something else?
"A. I don't know what else it could have been."
(R. 470-71.)
"Q. And did you also say there was some on the wrist?
"A. The forearm.
"Q. Okay. Is that what appeared to be white
"A. The same material.
"Q. Okay. So is it your testimony that it's consistent with tape or that it is tape?
"A. Consistent with it."
(R. 471.)
On direct examination, Case testified, without objection, about finding what appeared to be duct tape on a board that apparently had been used to bind the victim and in a can recovered at the scene of the crime. On cross-examination, Ingram's counsel brought out Case's findings relative to the tape in considerable detail. The record shows the following exchange:
"Q. [Defense counsel:] It says [referring to Case's report] `possible remains of charred duct tape.' Is that right?
"A. [Case]: Yes, sir.
"Q. You're not saying it was duct tape?
"A. It appeared to me to be duct tape, yes, sir.
"Q. You're not telling the jury you're certain it was duct tape?
"A. It appeared to me to be, but it being burned I could not examine the whole item.
"Q. That's what I'm getting at. You're not telling this jury that is duct tape.
"A. In my opinion it was, yes, sir, but it was not intact.
"Q. Are you telling this jury that was duct tape?
"A. In my best opinion, yes, sir."
(R. 509-10.)
The prosecutor discussed the testimony of the experts pertaining to the tape in final argument in the guilt phase, without objection, and defense counsel also discussed the testimony about the tape in his final argument. For instance, he stated:
"Now they put in evidence and there is evidence that the victim, Mr. Huguley, was taped to the bench or board with *1250 duct tape. Dr. Embry testified about the autopsy and what he found during the autopsy. And the report says that it appeared to be tape. If you recall when he was being questioned he said it might be tape. He could not tell you ladies and gentlemen that it was tape. I'd ask you to think about that. And Mr. John Case also said that he didn't see any tape on the board, but he got his instrument out. He couldn't see anything with the naked eye.... [A]nd he saw a space that in his opinion was indicative of tape.... He didn't know what kind of tape.... I'll ask you ladies and gentlemen, have you seen any tape during this whole trial? Think about that."
(R. 865-66.)
"While the trial judge should not allow the admission of clearly irrelevant evidence, `this court has long held [that] a party cannot complain of error in his favor.' Yeager v. Miller, 286 Ala. 380, 385, 240 So.2d 221, 224 (1970). See also Embrey v. State, 283 Ala. 110, 116, 214 So.2d 567, 573 (1968). The improper admission of evidence which tends to exculpate the accused constitutes harmless error under Rule 45, A.R.A.P. See Kelley v. State, 409 So.2d 909, 915 (Ala. Cr.App.1981). `Determinations of admissibility of evidence rest largely within the discretion of the [trial] court and will not be disturbed on appeal absent a clear showing of an abuse of discretion.' United States v. Roper, 874 F.2d 782, 790 (11th Cir.), cert. denied, [493] U.S. [867], 110 S.Ct. 189, 107 L.Ed.2d 144 (1989)."
". . . .
"The admission of merely immaterial and not prejudicial evidence is not reversible error. See Gilley v. Denman, 185 Ala. 561, 567, 64 So. 97, 99 (1913). `It has long been the rule that the erroneous admission of evidence on an immaterial issue is harmless.' Forest Investment Corp. v. Commercial Credit Corp., 271 Ala. 8, 12, 122 So.2d 131 (1960). The admission of irrelevant evidence which could not have affected the verdict is not reversible error. Saunders v. Tuscumbia Roofing & Plumbing Co., 148 Ala. 519, 523, 41 So. 982, 984 (1906)."
Kuenzel v. State, 577 So.2d at 511-12.
"`The general rule is that "[t]he criterion for admission of expert testimony is that the witness, by study, practice, experience, or observation as to the particular subject, should have acquired a knowledge beyond that of ordinary witnesses."' Bird v. State, 594 So.2d 676[644] (Ala.Cr.App.1990) (quoting White v. State, 294 Ala. 265, 271, 314 So.2d 857, 862, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975)).... The trial court acted within its discretion in determining that the ... testimony `enlightened the jury in an area beyond the average lay person's knowledge and assisted it in arriving at the truth.' Lee v. State, 565 So.2d at 1156."
Inmon v. State, 585 So.2d 261, 267 (Ala.Cr. App.1991).
In reference to the testimony pertaining to the bloodstains, we find that if error occurred in its admission, it was an error in Ingram's favor and tended to exculpate him. He did not object to the testimony, and through cross-examination of the serologist, he brought out the evidence he now objects to, and used the testimony to emphasize the fact that the bloodstains found could not be matched to anyone involved in the case, especially him, in an effort to cast doubt upon the state's case and in support of his defense.
As to the testimony pertaining to fingerprints, again we find that it was exculpatory, and if its admission was error, and we do not concede that it was, it was an error in Ingram's favor. Again, no objection was raised to the testimony. Ingram also brought out through cross-examination of the fingerprint expert the facts now complained of, and through cross-examination and closing argument attempted to cast *1251 doubt on the state's case by emphasizing the state's failure to connect him to the crime through fingerprint evidence.
As to the testimony pertaining to the gun, no objection was raised, and the testimony about the gun brought out on direct examination was also elicited on cross-examination. Ingram was obviously using the fact that the gun on the table was not the same gun used in the commission of the crime to cast doubt upon the state's case.
In reference to the testimony of the expert witnesses, no objections were raised to their testimony, and Ingram stipulated that they were qualified experts in their field. The record shows that Surrett, the fingerprint expert, was experienced and trained in his field, and there was no abuse of the trial court's discretion in permitting him to testify. As to Embry, the pathologist, and Case, the trace evidence expert, the records, supports a conclusion that they were qualified as experts in their fields, and the trial court did not abuse its discretion in permitting them to so testify. We further find that it was within their field of expertise to give their opinion that the material used to bind the victim appeared to be duct tape. In addition, on cross-examination of Embry and Case, Ingram's counsel brought out the testimony he now complains of, i.e., their opinions in regard to the tape. He also discussed their opinions in reference to the tape in considerable detail in his closing argument to the jury. It appears that his actions in not objecting to this testimony and in bringing it out himself and discussing it was designed to cast doubt on the state's case and to support his defense.
After reviewing the record in reference to the issues discussed above, we conclude that, under the circumstances presented, no error occurred in the admission of the testimony. However, if error did occur in reference to the admission of the testimony of one or more of the witnesses as discussed above, it was harmless and could not have affected the verdict. Because no objections were made to any of the witnesses' testimony, we must review the issues raised in this portion of Ingram's brief under the plain-error standard. We certainly find no plain error here.

VI.
Ingram contends that comments made by the prosecutor during closing argument at the guilt phase constituted reversible error. He specifically objects to the following:
"But I'll tell you this. There was a bunch of people out there, and you know a lot of them didn't come here to the courtroom and tell it. I wonder why? I wonder why they didn't come in here. I want to know why.... And there's a bunch of them out there that didn't want to get involved. I wonder why they didn't want to get involved. You know, I asked you in opening statementsI asked you, and I said `What makes a human being do something like this to another human being?'"
(R. 899.)
He contends that this argument was an unfavorable comment on his failure to call witnesses who were equally available to both parties and implied that potential witnesses were afraid of him.
No objection was raised in the trial court to this argument; hence, we must review this issue under the plain-error standard. In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. In doing so, we must evaluate the prosecutor's comments in the context of the entire trial. Duren v. State, 590 So.2d 360 (Ala.Crim.App.), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). The prosecution, as well as defense counsel, has the right to present its impressions from the evidence, and may argue every matter of legitimate inference that can be reasonably drawn from the evidence. Sanders v. State, 423 So.2d 348 *1252 (Ala.Cr.App.1982). If the argument is determined to be improper, the test for review is not whether the comments influenced the jury in arriving at its verdict, but whether they might have influenced the jury. Ex parte Ward, 497 So.2d 575 (Ala.1986); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975); Rutledge v. State, 523 So.2d 1087 (Ala.Cr.App.1987), rev'd and rem'd on other grounds, 523 So.2d 1118 (Ala.1988).
After examining the closing argument of the prosecutor, and particularly that portion set out above, we conclude that the prosecutor's comment was not a comment on Ingram's failure to call witnesses. There is nothing in the argument that could reasonably be interpreted as such a comment. Thus, there is no merit to this portion of Ingram's contention. Further, we do not agree with Ingram's contention that the prosecutor's argument implied that potential witnesses were afraid of Ingram. Ingram's reference in closing argument to the testimony of state witnesses that other people were present when the abduction occurred who were not identified was part of his attack on the credibility of the state's witnesses. And the prosecutor's argument referring to other people being present and not coming forward was a proper rebuttal or reply in kind to defense counsel's attack on the veracity of the prosecution witnesses. The prosecutor's argument relating to the possibility that witnesses might be afraid of, or feel intimidated by, Ingram was a legitimate inference to be drawn from the evidence.
We find that the closing arguments of the prosecution in the guilt phase were not improper. No error was committed in reference to the arguments, much less plain error.

VII.
Ingram contends that the trial court erred in overruling his motion made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which he claimed that the state exercised certain peremptory jury strikes in a racially discriminatory manner. He asks that his case be remanded to the trial court for a Batson hearing. In overruling the motion, the trial court found that Ingram had failed to establish a prima facie case of racial discrimination. In Batson, the United States Supreme Court held that black prospective jurors could not be struck from a black defendant's jury solely because of their race. Ingram is black.[7]
The state has the burden of articulating nondiscriminatory reasons for challenged strikes only after the defendant meets his burden of establishing a prima facie case of discrimination. Batson, 476 U.S. at 97, 106 S.Ct. 1712. And, until that burden is met, the state is under no obligation to offer explanations for its peremptory strikes. Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). Edwards v. State, 628 So.2d 1021 (Ala.Crim.App.1993); Jackson v. State, 594 So.2d 1289 (Ala.Crim.App.1991). In determining whether a prima facie case of discrimination has been established, the trial court is to consider all relevant circumstances that could lead to an inference of discrimination. Its determination on whether a prima facie case of discrimination has been established is to be accorded *1253 great deference on appeal. Ex parte Branch, 526 So.2d 609 (Ala.1987); Boyd v. State, 715 So.2d 825 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998). Its finding that a defendant did not present a prima facie case of discrimination under Batson is reviewed under a "clearly erroneous" standard. Wilson v. State, 690 So.2d 449 (Ala.Crim.App.1995), aff'd. in part, quashed in part, 690 So.2d 477 (Ala.1997).
In the instant case, the record shows that of the 16 blacks on the 46-member venire from which the jury was struck, the state struck 7 blacks. Each side had 16 strikes. Seven blacks served on the jury that tried the case. Ingram contended that the prosecution's striking of 7 out of 16 blacks on the venire constituted a prima facie Batson violation and showed systematic discrimination by the state in the selection of the jury. Ingram relied only on the bare numbers or statistics to support his Batson motion; he offered no additional supporting evidence. The numbers alone, in this case, will not support a reasonable inference of racial discrimination.
All relevant evidence may be examined by the trial court, including the numbers involved, to determine whether an inference of discrimination has been raised. However, "[w]hen considered alone, evidence of the prosecution's use of a large number of its peremptory strikes to exclude black jurors would allow, but would not compel, a finding of prima facie discrimination." Mines v. State, 671 So.2d 121, 123 (Ala.Crim.App.1995); Davis v. State. See also Ex parte Thomas, 659 So.2d 3 (Ala.1994). Even if the prosecution uses all its peremptory strikes to exclude black veniremembers, a trial court is not required to find that a prima facie case of discrimination exists if other relevant evidence proves the contrary. Mines v. State.
In the instant case, Ingram obviously failed to meet his burden; thus, the trial court's ruling that no prima facie case had been established was not clearly erroneous.
Ingram asserts for the first time on appeal, as evidence for this court's consideration in deciding whether a prima facie case had been established, that the Talladega County District Attorney's Office has a history of racial discrimination in jury selection. He cites only Walker v. State, 611 So.2d 1133 (Ala.Crim.App.1992), to support this assertion. His reliance on Walker v. State is misplaced. That case does not support his contention. Furthermore, we are not aware of any information that the district attorney of Talladega County or members of his staff had or has a history of racial discrimination in jury selection. We find no merit in this assertion.

VIII.
Ingram contends that the state failed to prove the proper chain of custody of the victim's body, the victim's hands,[8] and a charred board so as to allow either the admission of the items as evidence or testimony pertaining to the items. No objections were raised in the trial court to the state's alleged failure to prove the chain of custody of the body and the hands; however, an objection was made to the introduction into evidence of the board on the ground that the state failed to prove one link in the chain of custody as to it. The objection raising a question of a missing link in the chain of custody of the board was addressed specifically to the failure of Jeff Bevington, a contract driver for the Department of Forensic Sciences, to testify. We review this contention under the plain-error standard as to the admission of evidence pertaining to the body and the hands.
In Ex parte Holton, 590 So.2d 918 (Ala.1991), the Alabama Supreme Court stated the evidentiary foundation *1254 required to authenticate and identify demonstrative evidence, as follows:
"The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3)[the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a `missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a `weak' link. When the link is `weak,' a question of credibility and weight is presented, not one of admissibility."
Id., at 920.
"Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. In order to establish a proper chain, the State must show to a `reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.'"
Id., at 919-20 (citation omitted).
"A sealed envelope was adequate circumstantial evidence to establish the handling and safeguarding of the item... as authenticated."
Id., at 920. In reaffirming the rule stated in Holton, the Alabama Supreme Court stated in Kennedy v. State, 690 So.2d 1222 (Ala.1996), the following:
"The legal question always presented in this kind of case is whether the evidence is what it is represented to be. `The question of authenticity or proper identification is, in the first instance, for the trial judge as a preliminary matter.' Commentary to Rule 901, Ala. R. Evid.
"Under traditional Alabama law the evidence presented on the foundational requirement does not have to be conclusive or overwhelming; rather, it must be strong enough for the question to go to the jury."
Id., at 1224 (citations omitted).
The state's evidence tending to authenticate and identify the victim's body was as follows: On August 1, 1993, as a result of a telephone call, Rita Chatman, a deputy sheriff with the Talladega County Sheriffs Department, went to the scene of the crime at the ballfield in Mumford. She testified that upon her arrival she saw a burned body. She further testified that she secured the crime scene. Shortly thereafter, Mike McBurnett, an investigator with the sheriffs department, arrived at the scene. He testified that he saw what he believed to be a burned body of a black male lying under a tree. He took several photographs of the body; those photographs were admitted into evidence at the trial. Clarence Haynes, the deputy coroner, arrived at the scene a short time later, and upon his arrival, he saw a burned body. Without disturbing or altering the body in any way, he wrapped the body in a plastic sheet, placed it in a black leather body bag with a zipper, sealed it, initialed the seal, and turned the body over to Bevington, a contract driver with the Department of Forensic Sciences, for delivery to that department. At this point, the hands had not been removed from the body. Dr. Joseph Embry, the state medical examiner and pathologist, testified that *1255 he received the burned body of a black male in a sealed body bag, with the initials C.E.H. and J.P.B. on the seal, on August 2, 1993, from Bevington. He identified the initials C.E.H. as the initials of deputy coroner Clarence Haynes and the initials J.P.B. as those of Bevington. He performed an autopsy on the body, which was later identified as the body of Gregory Huguley, and testified extensively at the trial as to his findings. Bevington did not testify. When Bevington transported the body he was in the military service at Fort McClellan, but at the time of trial, he had been transferred to Germany and was unavailable. We find that the state proved a complete chain of custody for the victim's body; however, one link in the chain was weak because of the lack of direct testimony from the contract driver, Bevington. The state presented both direct and circumstantial evidence tending to prove that the body received by the forensic examiner was in the same condition as it was when discovered at the scene, placed in a body bag at the scene, which was sealed and initialed, and delivered to the examiner in the same body bag with the initialed seal intact. It was the jury's duty to determine how much weight to give the testimony of the examiner, based on the chain-of-custody evidence presented. Furthermore, we note that the nature and extent of the victim's wounds from burning were consistent from the time the body was found at the scene until the autopsy was conducted. There was no suggestion of any tampering with the body. See Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd. 711 So.2d 1097 (Ala.1997). As to the contention that the state failed to prove a sufficient chain of custody for the admission of the testimony of the forensic examiner pertaining to the body, we find no plain error.
The state's evidence tending to authenticate and identify the victim's hands was as follows: The chain of custody for the hands was the same as the body until the body came into the possession of Dr. Embry. Embry testified that he removed the victim's hands from the body, placed them in a sealed container, and turned them over to Mark Hopwood of the Department of Forensic Sciences. Hopwood testified that he turned the sealed container containing the hands over to Deputy Sheriff Mack Pruitt, and that when he did they were in the same condition as when he received them from Dr. Embry. Pruitt testified that he received the sealed container containing the hands from Hopwood, delivered them to Deputy Sheriff Charles Bonner, and that the container remained sealed while it was in his possession. Bonner testified that he delivered the sealed container to Marietta Prevost, a state fingerprint examiner, and that the container remained sealed while it was in his possession. Prevost testified that she received the sealed container containing the hands from Bonner; that she removed the hands from the container, fingerprinted them, returned them to the container, and gave the container with the hands back to Bonner. Prevost further testified that she determined that the fingerprints taken from the hands were the fingerprints of the victim, Gregory Huguley. Bonner further testified that Prevost returned the container containing the hands to him and that he then delivered them to Cooper Green Hospital. We find that the state proved a complete chain of custody of the hands. As we previously pointed out, one link of the chain was weak because of the lack of direct testimony from Bevington; however, this weakness would go to the weight to be given the evidence rather than to its admissibility. The state proved that the hands were in a sealed container and undisturbed from the time Dr. Embry removed them from the body until Prevost fingerprinted them. As to the contention that the state failed to prove a sufficient chain of custody for the admission of the testimony of the fingerprint examiner pertaining to the hands, we find no plain error.
The state's evidence tending to authenticate and identify the charred *1256 board found at the scene was as follows: Investigator McBurnett testified that when he arrived at the scene he saw a charred board about 10 feet from the burned body; that he photographed the board; and that he "collected" the board and wrapped it in a sheet. He identified the sheet and board at trial, as well as photographs he had taken of the board at the scene, and they were admitted into evidence. He positively identified the board at trial as the board he had "collected" at the scene. Haynes testified that he assisted McBurnett in wrapping and sealing the board and turning it over to the contract driver, Bevington, for transporting to the Department of Forensic Sciences along with the body. At trial, he identified the board as the one discovered at the scene, as well as the material that was used to wrap and seal the board. John Case, a trace evidence examiner, testified that he received the board from Bevington, the contract driver, and that it was wrapped in a sheet, sealed, and had initials on the seal. He testified that he examined the board and found traces of gasoline and properties consistent with duct tape. He was shown the board and the sheet wrapped around it at trial and testified that it was the same item that he had previously examined and that the sheet contained his and other initials. Upon completion of his examination of the board, he turned it over to Deputy Rita Chatman to be delivered to the Talladega County authorities. He further testified that the board was in the same condition when he delivered it to Chatman as it was when he initially received it. Chatman testified that she received the board from Case; brought it to Talladega; delivered it to McBurnett; and that it was in the same condition from the time she obtained it from Case until she turned it over to McBurnett. She further testified that during the time the board was in her possession it was wrapped in a sheet and sealed. McBurnett testified that he received the board from Chatman and maintained possession of it until he delivered it to the court reporter at trial. He testified that it remained in the same condition from the time he received it from Chatman until he turned it over to the court reporter. We find that the state proved a complete chain of custody for the charred board; however, one link in the chain was weak because of the lack of direct evidence testimony from Bevington. The state presented both direct and circumstantial evidence tending to prove that the board received by the trace evidence examiner was in the same condition as it was when discovered at the scene, wrapped in a sheet, sealed, initialed, and delivered to the examiner in the same sealed condition. As we have previously said, it was the jury's duty to determine how much weight to give the testimony of the examiner, based on the chain of custody evidence presented. As to the contention that the state failed to prove a sufficient chain of custody for the admission of the testimony of the trace evidence examiner pertaining to the board, and the board itself, we find no merit to it. The evidence was properly authenticated and admitted.

IX.
Ingram contends that the trial court should have instructed the jurors that the mitigating circumstance that he had no significant history of prior criminal activity had been proved as a matter of law and that they were compelled to find it as a mitigating circumstance and to consider it in the weighing process. Ingram did not object to the trial court's instructions on mitigating circumstances, therefore, any error in this regard must rise to the level of plain error.
We have reviewed the trial court's instructions in this regard and find that they are substantially identical to the instructions approved in Morrison v. State. The trial court fully informed the jury of the function of mitigating circumstances in its deliberations and the option to recommend against death as required by Spivey v. Zant, 661 F.2d 464 (5th Cir.1981), cert. *1257 denied, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982). The trial court in this case specifically instructed the jury under § 13A-5-51(1) that a mitigating circumstance it could consider if it found it to exist was the lack of a significant history of prior criminal activity on Ingram's part. Morrison v. State, 500 So.2d at 47. At the sentencing hearing before the jury, Ingram's counsel in his opening statement advised the jury that the statutory mitigating circumstance of no significant history of prior criminal activity applied to Ingram. He stated to the jury, "He has no prior criminal activity on record." (R. 940.) In the prosecutor's opening statement to the jury at the sentencing hearing, he stated:
"The defendant has no significant history of prior criminal activity. You have not been presented with any history of prior criminal activity at all by this defendant under the evidence. This mitigating circumstance, I submit to you, is before you. It is a circumstance for you to weigh against the aggravating circumstance."
(R. 1012.) In the prosecutor's closing argument at the sentencing phase, he again informed the jury, "[T]here's no question the mitigating circumstance number one exists [referring to the statutory mitigating circumstance of no significant history of prior criminal activity]." (R. 1022.)
Thus, the statutory mitigating circumstance that Ingram had no significant history of prior criminal activity was before the jury for its consideration and the state conceded its existence. In fact, the prosecutor informed the jury that it should weigh and consider that mitigating circumstance against the aggravating circumstances. We find that the trial court's instructions to the jury on mitigating and aggravating circumstances and on the jury's role in considering and weighing them complied with the law and were proper. The trial court was not required to specifically charge the jury that this particular mitigating circumstance did in fact exist as a matter of law.
Moveover, the trial court, as the final sentencing authority under § 13A-5-47, considered the aggravating circumstances and the mitigating circumstances in this case. In its findings of fact, the court specifically found that the mitigating circumstance of no significant prior criminal activity on the part of the defendant under § 13A-5-51(1) did exist, and considered that mitigating circumstance in determining the proper sentence to impose.
The trial court's instructions concerning the mitigating circumstances the jury could consider were proper.

X.
Ingram contends that the trial court's instructions to the jury in the guilt phase of the trial as to the elements of the offense charged, lesser included offenses, corroboration of accomplice testimony, and reasonable doubt were improper and violated his constitutional rights. He did not object at trial to the instructions given as to these matters now complained of, but stated to the trial court, upon conclusion of its instructions, that he was satisfied with them. Thus, we must consider these contentions under the plain-error rule.

A.
Ingram's contention that the trial court's instructions on the elements of the offense were improper is based solely on the instructions or lack of instructions as they related to the term "terrorize" in the kidnapping statute. Tracking language from the kidnapping statute, the trial court instructed the jury that a "person commits a kidnapping in the first degree if he abducts another person with the intent to inflict physical injury upon him or to terrorize him." See § 13A-6-43(a)(4) and (5). As to this term, the trial court instructed the jury, as follows: "The word `terrorize' has no definition as far as I can find in the Code. So I'm going to instruct you to use your common judgment and understanding *1258 as to what this particular word means." (R. 911-12.)
Ingram argues that trial court's instructions were deficient because they did not define the word "terrorize" for the jury, and thus left the jurors to apply whatever meaning they chose to apply to the word. He, in effect, is arguing that the lack of a more specific definition of the word fails to prevent arbitrary and discriminatory enforcement. We have held that the use of the word "terrorize" without further definition in the kidnapping statute does not render the statute unconstitutionally vague. Musgrove v. State, 519 So.2d 565, 582-83 (Ala.Crim.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). Our Supreme Court addressed this issue, involving the identical jury instruction, in the appeal of the companion case of Anthony Boyd, finding that the failure to define the word "terrorize" for the jury did not render the trial court's instruction deficient. Ex parte Boyd, 715 So.2d at 855.
A trial court has broad discretion in formulating its jury charge, so long as the charge accurately reflects the law and relevant facts. When reviewing a claim of error in a jury instruction, the jury charge must be construed as a whole and the language must be construed reasonably. Carroll v. State, 599 So.2d at 1270. When a term is included in a statute relevant to a case, and that term is not defined by statute, whether it is necessary for the trial court to define the term for the jury hinges on the facts of the case. Ivery v. State, 686 So.2d 495 (Ala.Crim. App.1996); Thornton v. State, 570 So.2d 762 (Ala.Crim.App.1990).
The word "terrorize" is not defined in our Code, and under the facts of this case, we find that it was not necessary for the trial court to further define it. Here, it could be given its common meaning. See Thornton v. State; Williams v. State; and Roberts v. State, 735 So.2d 1244 (Ala.Crim. App.1997).
The word, as it was used in this case, is clear in its meaning; it is not legal jargon or a term of art. The meaning of the word, to the extent that it was used in this case, and particularly under the facts of this case, could be understood by the average juror in its common usage. Thus, we find no plain error in the trial court's failure to define "terrorize" for the jury in this case.

B.
Ingram contends that the trial court's instructions to the jury in the guilt phase on the lesser included offenses of murder and kidnapping were inadequate because, he says, they did not sufficiently distinguish these offenses from the capital offense charged. Initially, we observe that he failed to object to the trial court's instructions in this regard. In fact, he stated that he was satisfied with the instructions. We must, therefore, review this contention under the plain-error standard.
A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Crim.App.1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, Stewart v. State, 601 So.2d 491 (Ala.Crim.App.1992), aff'd in relevant part, 659 So.2d 122 (Ala.1993), and we must evaluate instructions like a reasonable juror may have interpreted them. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Stewart v. State.
We have reviewed the trial court's instructions to the jury in this case, in their entirety, and find that they are an accurate and understandable reflection of the law and the facts of the case. The instructions on the lesser included offenses, contrary to Ingram's contentions, were proper, were clearly distinguishable from the instructions on the capital offense charged, and, in our opinion, were not misleading or confusing to the jurors.
*1259 It appears that Ingram is also contending that the trial court erred in not sua sponte instructing the jury on felony-murder as a lesser included offense. "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." § 13A-1-9(b). See also Coral v. State. After a review of the record, we find no rational basis for a verdict convicting Ingram of felony-murder. No evidence was presented at trial to support such an instruction. We addressed this identical issue in the companion case of Boyd v. State, and reached the same conclusion.
It also appears that Ingram is contending that the trial court's instructions to the jury on the element of intent to kill were confusing or erroneous. We do not agree; the instructions were proper.
To summarize, we find that the trial court properly instructed the jury on the lesser included offenses and intent to kill, and did not err in failing to instruct the jury sua sponte on felony-murder. We find no merit in these contentions, and, thus, no plain error.

C.
Ingram contends that the trial court's instructions to the jury on the necessity of corroboration of an accomplice's testimony was insufficient. He also contends that the state's evidence was insufficient to corroborate Cox's testimony. As we have previously mentioned, Cox was a participant in the crime, and he testified for the state, pursuant to a plea agreement. No objection was raised at trial to these instructions or to the sufficiency of the evidence of corroboration. We, thus, review these contentions under the plain-error standard.
A felony conviction cannot be had on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense. Kuenzel v. State; § 12-21-222. The corroboration evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense; it need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Kuenzel v. State; Andrews v. State, 370 So.2d 320 (Ala.Crim.App.1979). The process for determining whether the accomplice's testimony was sufficiently corroborated is a subtraction process, whereby the accomplice's testimony must first be eliminated and the remaining evidence then examined to determine if it sufficiently connects the defendant with the offense. Carden v. State, 612 So.2d 509 (Ala.Crim.App.1992); Ex parte Bell, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985).
After examining the record in this case, we find that the Cox's testimony was amply corroborated by the testimony of a number of witnesses and by much demonstrative evidence. Cox's testimony that he and the other perpetrators of the crime were driving a blue van when they committed the offense was corroborated by a witness's testimony that one of the perpetrator's rented such a van during the weekend the crime was committed. Cox's testimony that they stopped at the "Happy Tree" and that they kidnapped the victim at gunpoint from the street and that the victim pleaded for his life, was corroborated by the state's witness, Sharon Ackles, and by several other witnesses. One witness testified that he observed all four participants in the van at the time of the kidnapping. Cox's testimony that they purchased gasoline in a black plastic container with a red top was corroborated by the fact that such items were found at the scene of the murder. His testimony that duct tape was used to bind the victim to a board or bench, and to bind the victim's arms and close his mouth was corroborated by state's witnesses who testified that they found traces of duct tape on the victim's body, mouth, and on a burned *1260 board found at the scene of the murder. Cox's testimony that gasoline was poured on the victim and that he was set afire was corroborated by testimony of state witnesses, who found traces of gasoline on the body and on items taken from the scene of the murder. Furthermore, Ingram's girlfriend, Julie Williams, testified that Ingram told her of his participation in the crime shortly after its commission. She testified that Ingram told her that he and the other perpetrators had seized the victim, taken him to Mumford, tied him to a bench, poured gasoline on him, and set him on fire.
We find that the trial court's instructions to the jury on the necessity of corroboration of accomplice testimony were sufficient and proper. We also find that the evidence apart from the testimony of the accomplice, Cox, was ample to connect Ingram to the offense and to corroborate the accomplice's testimony. This same issue arose in the companion case of Boyd v. State, where we reached the same conclusion. We find no merit in these contentions, and certainly, no plain error.

D.
Ingram contends that the trial court's instructions on reasonable doubt violated the holding of the United States Supreme Court in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The essence of his contention is that the trial court's instructions on reasonable doubt impermissibly diluted the state's burden of proof, in violation of his constitutional rights. He bases this contention on the following instruction given in the guilt phase of the trial:
"What is a reasonable doubt? When I say the state is under the burden of proving guilt beyond a reasonable doubt and to a moral certainty, that does not mean that the state must prove an alleged crime beyond every imaginable or speculative doubt or beyond all possibility of mistake because that would be impossible.
"A reasonable doubt means an actual doubt. It could arise out of the testimony in the case, or it could arise from the lack of testimony in the case. It is a doubt for which a reason can be assigned, and the expression `to a moral certainty' means practically the same thing as beyond a reasonable doubt, because if you are convinced to a point where you no longer have a reasonable doubt then you are convinced to a moral certainty."
(R. 919-20.)
At the sentencing phase of the trial before the jury, the trial court referred to its earlier instructions on reasonable doubt, but did not restate them. Ingram also complains of the number of times the trial court used the expression "moral certainty" in its instructions. Ingram did not object in the trial court to the court's instructions on reasonable doubt, but, in fact, stated that he was satisfied with them. Thus, we review this contention under the plain-error standard.
Initially, we point out that we have previously approved of the use of this exact instruction on reasonable doubt in the face of a contention that it violated the rule of Cage. See Burton v. State, 651 So.2d 641, 654-655 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). See also Smith v. State, 588 So.2d 561 (Ala.Crim.App.1991), involving substantially the same instruction that was found not to violate Cage.
The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Cage, the United States Supreme Court held that the definition of reasonable doubt provided in the jury instruction was such that "a reasonable juror could have interpreted the instruction to *1261 allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." However, subsequently, in Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the Supreme Court expressly overruled the standard applied in Cage. Estelle holds that when reviewing ambiguous jury instructions, an appellate court must determine "`whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way' that violates the constitution. Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)." 502 U.S. at 72, 112 S.Ct. 475. We now follow the standard set out in Estelle and Boyde. See, e.g., Williams v. State; Knotts v. State, 686 So.2d 431 (Ala. Crim.App.1995), aff'd, 686 So.2d 486 (Ala. 1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997). Ingram's contention must be reviewed in light of this standard.
Ingram complains of the use of the term "moral certainty" by the trial court in defining reasonable doubt. The Supreme Court in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), noted that the use of that term in this context is disfavored because it may imply that jurors may base their verdict on factors other than facts that have been demonstrated by the evidence. However, the court in Victor also stated, "The Constitution does not dictate that any particular form of words be used in advising the jury of the government's burden of proof, so long as `taken as a whole, the instructions correctly conveyed the concept of reasonable doubt.' Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150...." 511 U.S. at 22, 114 S.Ct. 1239. The Court reviewed the jury instruction under attack in the context of the entire charge and held that the inclusion of the phrase "moral certainty" did not render the instruction unconstitutional. 511 U.S. at 22, 114 S.Ct. 1239.
In the case now before us, we consider whether, in the context of the entire jury instructions, the instructions objected to have sufficiently directed the jurors to the evidence in such a manner that there is no reasonable likelihood that they arrived at a finding of guilt based on factors other than the evidence presented in the case. The trial court's instructions defining reasonable doubt repeatedly emphasized the jury's obligation to base its findings on the evidence introduced at trial. The trial court's instructions provided a sufficient context to lend meaning to the term "moral certainty" by relating this phrase to a conclusion based only upon a fair and impartial consideration of all the evidence. Considering the trial court's jury instructions as a whole and the context in which the instructions complained of above were used, we find that there is no reasonable likelihood that the jurors applied the instructions concerning reasonable doubt in an improper manner. Taken as a whole, we find that the instructions correctly conveyed to the jury the proper concept of reasonable doubt. We find no plain error in the jury instructions given in this case.

XI.
Ingram contends that the voir dire examination of the jury venire in his case "was conducted in an improper manner and allowed jurors who were not impartial to be seated." The record shows that Ingram filed a pretrial motion requesting that voir dire be conducted by sequestering the venirepersons and questioning them separately and individually. At a pretrial hearing on the motion, the trial court, without objection, deferred ruling on the motion, stating:
"We can defer that until a little bit later on if that will be agreeable. Then the motion for individual voir dire, we will just defer that until later on. More than likely we will do some individual voir dire examination. It may not be that we do all of it, but you know, generally we start out and ask general questions of everybody. Then when we get to the critical questions that you are *1262 most interested in, we usually do individual voir dire. We will probably do something similar to that when this case is presented to the jury."
(R. 52-53.)
At the beginning of the jury selection process, the trial court addressed introductory remarks to the venire, read the indictment, identified the parties and their counsel, outlined the nature of the case, explained the purpose of the voir dire examination, and asked general questions touching on the prospective jurors' qualifications to serve.
The trial court divided the venire into four panels of 13 veniremembers each and conducted the voir dire examination by panel. After preliminary questions by the trial court addressed to each panel, counsel for the state and for the defense conducted extensive voir dire. They were not limited in their questioning in any manner. When the voir dire began, the trial court stated: "Get the first panel, Mr. John (bailiff). When you get to those questions relative to change of venue and also relative to the death penalty, we will take them up probably individually at that time, depending on how the questions unfold." (R. 72.) Venirepersons who indicated during voir dire that they had read or had heard about the case and those who expressed some reservations about imposing the death penalty were questioned individually. No objection was raised to the procedure followed by the trial court. Thus, it appears from the record that Ingram did not obtain a ruling from the trial court on his motion for individual voir dire, nor did he raise any objection as to the manner in which it was conducted.

A.
Ingram contends that the trial court's failure to question veniremembers about their potential bias based on their relationships with employees of the district attorney's office and key state witnesses deprived him of the right to select a fair and impartial jury. No objection was raised in the trial court in this regard. Ingram's assertion here is that the trial court should have sua sponte explored the potential bias of prospective jurors who knew the district attorney or members of his staff, or key state witnesses. The record shows that the prosecutor asked each potential juror if he or she knew him or any member of his staff in an obvious effort to detect any bias against the state. Likewise, Ingram's counsel asked each potential juror if he or she knew the district attorney or members of his staff, or the state's witnesses. In response, two members of the first panel, four members of the second panel, seven members of the third panel, and three members of the fourth panel stated that they knew either the district attorney or a member of his staff. The four veniremembers on the second panel, in response to questioning by defense counsel, informed the trial court that they could put aside the fact that they knew the district attorney or members of his staff and base their decision on the law and the evidence presented in the case; the other panels were not asked this question.
The qualifications of prospective jurors rests within the sound discretion of the trial judge. Ex parte Cochran, 500 So.2d 1179 (Ala.1985). How far counsel may go in asking questions of the jury on voir dire, and the nature, variety, and extent of those questions are left to the discretion of the trial court. Dawkins v. State, 455 So.2d 220 (Ala.Crim.App.1984). Once a juror makes an initial statement that is vague, ambiguous, equivocal, uncertain, or unclear or that shows confusion, it is the trial judge's function to question the juror further, in an effort to ascertain whether the juror can be impartial. Knop v. McCain, 561 So.2d 229 (Ala.1989). Morrison v. State, 601 So.2d 165 (Ala. Crim.App.1992). Ala.Code 1975, § 12-16-6, provides as follows:
"It is the duty of the court, before administering the oath prescribed by law to any grand, petit or tales jurors, to *1263 ascertain that such juror possesses the qualifications required by law, and the duty required of the court by this section shall be considered imperative."
In the instant case, there was nothing in the prospective jurors' responses that indicated that knowing the district attorney or members of his staff or any state witnesses would affect any juror's ability to be impartial. There were no responses that called for the trial court to make further inquiry. Defense counsel certainly knew that he was not limited in any way in conducting voir dire, and the fact that he did not ask the prospective jurors on all of the panels if they could put aside their acquaintance with the district attorney or members of his staff and render a verdict based on the law and the evidence, indicated that he was satisfied with the responses he received. We find no merit in Ingram's contention. The trial court committed no error here, and certainly no plain error.

B.
Ingram contends that the trial court erred in failing to allow individual sequestered voir dire on all subjects. He argues that "Because all of the voir dire except that dealing with publicity was held in an open setting, genuine questioning on the issues [apparently referring to the expected evidence of Ingram's involvement in drugs] was impossible, and little was learned about potential bias."
In Alabama there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court. Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Kuenzel v. State. See also Haney v. State.
The record reflects that a thorough voir dire examination of the prospective jurors was conducted. We conclude that the trial court did not abuse its discretion in its handling of the voir dire examination. Contrary to Ingram's argument, we find that genuine questioning on all issues during voir dire was possible, and we further find that the method of examination provided reasonable assurances that prejudice and bias, if present, would have been discovered. We find no error in the manner in which the voir dire was conducted and the jury empaneled.
Ingram raises additional issues in footnote 13 in his brief to this court. He contends in that footnote that the initial qualification of the venire does not appear in the record; according to him, this indicates a violation of his right to be present during every aspect of the jury selection process and denies him a complete record on appeal. These issues were not raised in the trial court. He gives no specific information about what part of the record he contends is missing, and we can find none. We find no merit in his contentions, and, thus, no error, much less plain error.
Ingram further contends that error was committed when the trial court allegedly told the venire during voir dire examination that there were "certain attitudes or beliefs they just must not have," which, he argues, precluded the venirepersons from giving "honest" answers to questions directed to them. (Appellant's brief, p. 38.) We do not agree. Ingram misreads and misinterprets the trial judge's questions and comments during his qualification of the venire. The record is clear that the trial court was only seeking to determine if the prospective jurors possessed the necessary qualifications to serve on the jury, and there was no reasonable likelihood from the questions and comments that any prospective juror could have been misled, confused, unduly influenced, or encouraged to give an answer that was less than truthful. We find no merit in this contention, and no error or plain error.

XII.
Ingram contends that he was denied his constitutional right to a fair trial because of the prosecution's alleged misconduct in *1264 asking leading questions of the state's witnesses, in misstating facts and law to the jury, and in engaging in inflammatory argument to the jury.

A.
Ingram argues that the prosecutor continually asked leading questions of witnesses to such an extent as to be offering testimony himself. He does not point out in his brief the specific questions he objects to, except in one case. In that case the objection to the leading question was sustained. He merely refers us to 28 pages in the record where he contends leading questions were asked. We have examined the questions asked on those pages, as well as all of the testimony of the state's witnesses. Of the arguably 28 leading questions appearing on these pages, Ingram objected to only seven. Of those seven, the trial court sustained the objection as to two, overruled the objection as to three, and no adverse ruling was obtained as to the other two.
Whether to allow or disallow a leading question is within the discretion of the trial court, and except for a flagrant violation, will not be held to be reversible error. Jones v. State, 292 Ala. 126, 128, 290 So.2d 165, 166 (1974); Lawhorn v. State, 581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991); Ruffin v. State, 582 So.2d 1159 (Ala.Crim.App.1991); C. Gamble, McElroy's Alabama Evidence § 121.05 (4th ed.1991).
After a review of the record of the three times that Ingram specifically objected on the ground that the question asked was leading, we find that the trial court did not abuse its discretion in overruling the objections. We have reviewed the record as to all the other leading questions referred to, except the two where objections were sustained, and find no plain error. We further find that none of the questions objected to led to the admission of illegal evidence, and no prejudice resulted to Ingram as a result of the leading nature of the questions.

B.
Ingram argues that the prosecutor misled the jury at various times during the trial of the case by injecting facts not in evidence, by misstating facts, and by arguing incorrect law. Again, Ingram does not specifically identify and discuss the conduct of the prosecutor he complains of; he simply refers us to pages in the record where he alleges misconduct is reflected.
First, Ingram argues that during the voir dire examination of the jury venire the prosecutor made incorrect statements of law concerning the state's burden of proof. He calls our attention to four pages in the record where he says this is reflected, pages R. 81, R. 123, R. 177, and R. 232. We have examined those pages and find that no objections were raised at the time to the questions and/or statements of the prosecutor. We also find from our examination that the statements or questions of the prosecutor in this regard were not incorrect. Thus, we find no error, and certainly no plain error.
Second, Ingram argues that the prosecutor misled the jury venire as to what was required in prosecuting the codefendants, and he calls our attention to pages R. 85, R. 86, and R. 184 of the record. We have examined those pages and find that no objections were raised to the prosecutor's statements or questions to the venire in this regard, and further find that the statements or questions were not improper. Thus, we find no plain error.
Third, Ingram argues that the prosecutor misstated the law of complicity and kidnapping in defining those terms to the jury in his opening statement. He calls our attention to pages R. 308 and R. 311 of the record. We find, after reviewing the record, that no objections were raised to the prosecutor's statements in reference to these legal terms, and we also find that the *1265 prosecutor's statements of the law were not incorrect. There is no plain error here.
Fourth, Ingram argues that during the trial the prosecutor injected facts not in evidence. He directs us to pages R. 468-69 of the record, where Dr. Embry, the state pathologist, testified that burning was the cause of the victim's death and that he assumed the victim was alive when he was set afire because soot was found in the victim's nostrils. Dr. Embry testified that in reaching this opinion, he assumed that the events surrounding the victim's death occurred at the same time. Ingram apparently objects to this assumption, and he, in effect, argues that evidence had not been introduced by the state to support such an assumption. We find no reversible error here. The subsequent testimony of a state witness, Quintay Cox, a codefendant, clearly established that seizing the victim, taping him to the bench, pouring gasoline on him, and setting him afire while he was alive occurred at one time as Dr. Embry had assumed. If any error occurred by the trial court's overruling the objection when initially made, it was subsequently cured or rendered harmless by Cox's testimony. Ingram also directs us to page R. 479 of the record and argues that the prosecutor's use of the word "accelerant" in questioning Dr. Embry constituted injecting a fact not in evidence. An objection was made on the ground that there had been no testimony about an accelerant, and it was overruled. We find no error in the ruling. Ingram had previously brought out on cross-examination of Dr. Embry that gasoline had been used to burn the victim. It was brought out that it was common knowledge that gasoline was an accelerant and the terms "gasoline" and "accelerant" were frequently used interchangeably. There is no merit in this argument and no likelihood that the jury was confused by the use of the terms.
Fifth, Ingram argues that the prosecutor misstated the law in his closing argument to the jury.

(1)
Ingram asserts that the prosecutor told the jury that it should not consider the fact that a witness testifies for the state in exchange for leniency. He refers us to page R. 895 of the record. After reviewing the portion of the record referred to, we find that no objection was made, and, further, that the record does not support Ingram's assertion. His assertion is untrue.

(2)
Ingram further asserts that the prosecutor misstated the legal definition of intent, and he refers us to page R. 849 of the record. We find, after reviewing the record, that his assertion is not supported by the record, and is, in fact, incorrect. Again no objection was raised to this portion of the record.

(3)
Ingram asserts that the prosecutor misstated facts in an effort to secure a capital conviction, and he refers us to pages R. 856, R. 861, R. 892, and R. 902 of the record. We have reviewed the portions of the record referred to; first, we point out that no objections were raised to any portion of the argument, and second, we find that the portions of the argument referred to were not improper, but were legitimate comments on the evidence.
Sixth, Ingram argues that in arguing the state's case to the jury in the penalty phase of the trial, the prosecutor erroneously urged the jury to view its verdict as a recommendation. He refers us to page R. 931 of the record. No objection was raised when the argument referred to was made. We find, after reviewing the record, that it does not support Ingram's argument. His contention *1266 is simply incorrect. The record shows the following:
"MR. RUMSEY [prosecutor]: Ladies and gentlemen, I told you at the outset that this was a bifurcated trial, and now we are in what's called the sentencing stage of the trial. It should be very short relative to the guilt stage. Initially we will not offer any evidence because the law says that everything that has been proved to you in the guilt stage is also admissible in the sentencing stage. So there will be some testimony. There will be a summation and of course the judge's charge as to the law, and then you will make a recommendation to the judge. And even though the statute says recommendation, it is a very, very important part of the trial. I think the judge will tell you as he charges you as to the law that basically this is about what we talked about in voir dire that you would render a verdict based upon the evidence and based upon the law just like in the guilt stage. It carries the same thing in the sentencing stage."
(R. 930-31.)
"Under Caldwell v. Mississippi, 472 U.S. 320[, 105 S.Ct. 2633, 86 L.Ed.2d 231] (1985), `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentencing verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `Comments which accurately explain the respective functions of the Judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."' Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987)."
Martin v. State, 548 So.2d 488, 494 (Ala. Crim.App.), aff'd, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
In the present case, the prosecutor did not misrepresent the effect of the jury's sentencing recommendation or "urge" the jurors to see their verdict as a recommendation. The prosecutor's remarks clearly defined the jury's role in the sentencing scheme, were legally correct, and did not tend to mislead or to misinform the jury.
Ingram further argues that the prosecutor erred in urging the jury, in his closing argument in the sentencing phase of the trial, to put aside all personal feelings and sympathy in arriving at its verdict. He refers us to page R. 1024 of the record. We have reviewed the record as to this contention and find no error in the comments. They are no more than the prosecutor's urging the jury not to be distracted by matters unrelated to the evidence, but to confine itself to the facts in evidence and to the law given to the jury as the court charged. See Haney v. State. See also California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).
Ingram further argues that the prosecutor improperly told the jury in his closing argument in the sentencing phase that "mitigation could not come from Mr. Ingram's family members." (Appellant's brief, p. 41.) He refers us to page R. 1025 of the record. No objection was raised in the trial court. We have reviewed the prosecutor's closing argument in this regard and we find that the alleged portion of the prosecutor's argument in Ingram's brief that "mitigation could not come from Mr. Ingram's family members" is incorrect. The prosecutor made no such comment. After considering the argument in reference to comments concerning mitigation and considering it in its entirety, we do not find it to be improper.
*1267 Finally, as to all the contentions set out above with the exception of those set out in paragraph 4 in part B, we find no plain error. As to the contentions set out in paragraph 4 in part B, we find that no error was committed by the trial court in overruling the objections to the questions directed to Dr. Embry and admitting his testimony.

C.
Ingram contends that the state engaged in inflammatory argument and that its doing so deprived him of the reliable trial and sentencing required under the state and federal constitutions. He states that "the prosecutor told the jurors that a criminal defense is nothing more than an attempt to confuse the issue, as if guilt were a foregone conclusion." (Appellant's brief, p. 42.) He refers us to page R. 127 of the record. The remarks that he apparently refers to in the record did not occur in oral argument but during voir dire examination of the jury venire, and no objection was made to the remarks. The prosecutor's remarks referred to by Ingram were as follows:
"I think that you'll know that there's four people that [were] actually charged in this case. The law requires under the facts of this case that we try these cases separately. Now, this week we are trying Robert Shawn Ingram. Quite often when you have multiple defendants, one defendant will do this and do that and try to shift to the other people. It's what I call confusing the issues or trying to shift the spotlight over to somebody else. Is there anybody that if you are selected as a juror can't try this case without wondering what's going to happen about the other three people? Is there anybody that feels like that in trying this case that they can't follow the judge's instructions as to the law, that our concern is this case? Is there anybody that feels like that?"
(R. 126-27.)
We believe Ingram mischaracterizes or misinterprets the prosecutor's remarks or questions. They were not improper and they certainly do not constitute plain error.
Ingram further argues that error occurred when the trial court allowed the prosecutor in argument to the jury to seek the death penalty by commenting on "drive-by shootings" and "drug wars" and by telling the jury that capital punishment was a form of "self defense" and was imposed "for the sake of society." (Appellant's brief, p. 42.) He calls our attention to pages R. 901 and R. 1026-27 of the record. In his closing argument in the guilt phase of the trial, the prosecutor stated as follows:
"What this case is about is intimidation. It's about fear. It's about less fortunate people like Greg Huguley who are addicted to the use of a drug, and it's about why areas of this state and this nationthat people do not feel safe. That people do not feel protected and do not feel secure. You know, law and order, a term often usedlaw is simply rules that citizens place upon themselves to govern their conduct; and order is what we are trying to preserve. But there are areas in our state and in our nation where law does not prevail, but lawlessness prevails. Where people like Greg Huguley, the less fortunate people in this world, are told to be kept in line because if they don't they used to be beat up. Then there was cutting. Then they were shot. Then there was driveby shootings. The great American tragedy of drugs and violence.
"MR. NELSON: Your Honor, we object to that. That's improper argument. I don't recall any testimony about cutting, shooting, or drive-bys or anything of that nature.
"MR. RUMSEY: Well, I say that to get this.
"MR. NELSON: Can I ask for a ruling please?

*1268 "THE COURT: Overrule."
(R. 900-01.)
In his closing argument in the sentencing phase of the trial before the jury, the prosecutor stated as follows:
"And capital punishment. I will tell you what it is. Is the ancient doctrine of self-defense. If one believes that a person has a right to kill an intruder in his home who is going to kill or harm his family, that is the law, then surely one must believe that society has that same right, and it is society's right of self-defense. And as I listened to his family, and I didn't ask them a single question. There wasn't any need to. They're earnest when they ask you what they ask you. But as I listen to them plead for him, I think about the pleas of Gregory Huguley, and I think about the merciless now pleading for mercy. I think aboutwhen I listen to their testimony, I think about it's hard for me to reconcile what I'm hearing from them as to what I've heard from this evidence this week. And I'll submit to you, ladies and gentlemen, have you ever seen a oneeyed Jack in a deck of cards? You see one side of his face. That's what they see. There's the other side, and as you do what you think is fair, and as you do what you think is just, and as you do what you think is right, and you stand firm for it under the law and under the evidence, think about this: Think about where we've been as a society, where we are as a society, and where in the world we're going as a society, because that man seated right over there, he's told you what the value of human life is to him, $200.
"You do what you think is right, and you do what you think is just. But I submit to you the evidence in this case shows that the proper verdict, the right verdict, and in fact the just verdict of everybody involved and for the Greg Huguley's of this world is death. Thank you very much."
(R. 1026-27.) No objection was made in the trial court to this portion of the argument.
"`During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1989[1988]), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala. Cr.App.1990), aff'd, 590 So.2d 369 (Ala. 1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted)."
Coral v. State, 628 So.2d at 985.
"In Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement. Embrey v. State, 283 Ala. 110, 118, 214 So.2d 567 (1968).
"This line of argument is `within the latitude allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to *1269 punish crime, but protect the public from like offenses and as an example to deter others from committing like offenses.' Varner v. State, 418 So.2d 961 (Ala.Crim.App.1982); Cook v. State, 369 So.2d 1243 (Ala.Crim.App.1977), affirmed in part, reversed in part on other grounds, 369 So.2d 1251 (Ala.1978)."
Ex parte Waldrop, 459 So.2d 959, 962 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). See also Sockwell v. State, 675 So.2d 4 (Ala.Cr. App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).
The prosecutor's remarks in his closing argument to the jury in the guilt phase and in the sentencing phase, which we have set out above, were clearly a general appeal for law enforcement when viewed in context of his entire argument. They were well within the latitude allowed prosecutors in making such arguments; they were not improper. The trial court properly overruled Ingram's objection to the above argument in the guilt phase, and the above argument in the sentencing phase did not constitute plain error.

XIII.
Ingram contends that his "request for mental health assistance was handled in a manner inconsistent with the Fifth, Sixth, Eighth, and Fourteenth Amendments and Alabama law." He argues that the absence of any meaningful mental health assistance rendered his trial and sentencing fundamentally unfair. He asserts that the trial court erred when it held a hearing on his motion for a courtordered mental examination in open court and ordered that the preliminary report be turned over to the court and the prosecutor, that he was never provided with a licensed psychologist or psychiatrist to perform a mental evaluation, and that he was never given a jury trial on the question of his competence to stand trial, as he had requested.
Ingram filed a pretrial motion on November 21, 1994, seeking a court-ordered mental examination by a "qualified mental health professional" to determine his "present" mental condition and his competency to stand trial, his mental condition at the time of the commission of the offense, and a hearing before a jury to determine his competency to stand trial. In his motion, he alleged the following:
"As attorneys for the defendant, we question the defendant's competency to stand trial and believe that it is essential for a mental examination to be conducted in advance of trial because:
"1. The defendant is charged with a capital offense that is punishable by death by electrocution. The defendant does not understand the serious nature of the offense with which he is charged and the possible consequences of his alleged acts.
"2. The alleged acts of the defendant are of such a serious nature that we question the defendant's mental state."
(C.R.26-26.)
At a hearing on the motion on January 12, 1995, the record shows the following:
"MR. FANNIN [defense counsel]: Judge, we filed a motion for a mental exam approximately a month ago. I would just like to
"THE COURT: Has he been interviewed by the mental health folks yet?
"MR. FANNIN: I don't think so, Judge.
"THE COURT: What I'll do is order them to do a preliminary interview. If they come back with a recommendation that we need to do something else, we will have a hearing on it and go forward. I will set the mental examination for next Tuesday afternoon at 1:00.
"MR. FANNIN: All right.
"THE COURT: Can you in the meanwhile talk to Mr. Gary Garner to see if he can either go over or get somebody in his office to do a preliminary?
"MR. FANNIN: Yes, sir, I'll do that. That's all we have other than the discovery *1270 which Mr. Gibbs [prosecutor] has told us he will give us soon.
"MR. GIBBS: Are we having the hearing on whether further examination is necessary?
"THE COURT: What I would want to have is this man or lady that goes over and makes a preliminary, that she be prepared to come testify in a hearing to see whether or not an evaluation should be done by Taylor Hardin [state mental health facility].
"MR. GIBBS: We'll do that Tuesday afternoon at the same time?
"THE COURT: It's tentatively set at 1:00."
(C.R.13-14.)
At a second hearing on January 17, 1995, the following occurred:
"MR. FANNIN: Judge, we have previously filed that motion for mental examination. Last week at our status hearing you asked me to get in touch with Mental Health and get somebody down to talk to Mr. Ingram in jail. I talked with Mr. Garner today and he said that Mr. Ingram had not been interviewed because the man that does those interviews is off for a period of time. He said that he expects him to be down there tomorrow to see Mr. Ingram.
"THE COURT: On Wednesday?
"MR. FANNIN: Yes.
"THE COURT: Would you ask him to give me a written report by Friday?
"MR. FANNIN: Yes, sir.
"THE COURT: Send it to [me] and I'll give a copy to the state and defendant. Then if it looks like we need to have a mental competency hearing we will set it down for sometime next week, which is during jury civil week, but we can work it in toward the end of the week.
"MR. FANNIN: All right, Judge.
"THE COURT: What's the man's name that will be doing the report?
"MR. FANNIN: Michael Quay, Q-u-a-y."
(C.R.27-28.)
Ingram was subsequently examined by Michael H. Quay, M.S., a crisis intervention counselor at the Cheaha Mental Health Center, and Quay filed a report with the trial court on January 25, 1995, stating the following:
"The above individual was seen and underwent a mental status exam. This 23 year old black male was evaluated at the Talladega County jail at the request of the Circuit Court of Talladega County. Mr. Ingram does not appear to suffer from any form of mental illness, nor does he exhibit suicidal ideations. Overall, he is well-oriented, expressed himself well verbally, and appears to be of average to above average intelligence.
"It is my professional opinion that Mr. Ingram meet[s] the following guidelines:
"1. He is mentally competent to stand trial.
"2. He is capable of understanding right from wrong.
"3. He understands the serious nature of being charged with capital murder.
"4. He is capable of assisting his attorneys with court proceedings.
"5. He does not appear to need further psychiatric evaluation."
(C.R.27.)
"A defendant does not have a right to a mental examination whenever he requests one, and, absent such a right, the trial court is the screening agent of such requests. Robinson v. State, 428 So.2d 167 (Ala.Cr.App.1982); Beauregard v. State, 372 So.2d 37 (Ala.Cr.App.), cert. denied, 372 So.2d 44 (Ala.1979). The defendant bears the burden of persuading the court that a reasonable and bona fide doubt exists as to the defendant's mental competency, and this is a matter within the discretion of the trial court. Miles v. State, 408 So.2d 158 (Ala.Cr. App.1981), cert. denied, 408 So.2d 163 *1271 (Ala.1982). In determining whether an investigation into the defendant's sanity is required, the trial court must determine if any factual data establish a reasonable ground to doubt the defendant's sanity. Beauregard, 372 So.2d at 43. Where the trial court finds that the evidence presents no reasonable grounds to doubt the defendant's sanity, the standard of appellate review is whether the trial court abused its discretion. Id."
Cliff v. State, 518 So.2d 786, 790 (Ala.Crim. App.1987). See also Stewart v. State, 562 So.2d 1365 (Ala.Crim.App.1989); Russell v. State, 715 So.2d 866 (Ala.Crim.App.1997); Ala.R.Crim.P. 11.
Ingram's burden for purposes of his motion seeking a state-funded mental evaluation was to establish a reasonable doubt as to his competency to stand trial or to establish that his sanity at the time of the offense would be a significant factor at trial. Based on the record of the proceedings before us, we find that he did not meet this burden. The motion requesting a mental examination was very general and conclusory. The only allegation made in the motion was that Ingram did not understand the serious nature of the offense or the possible consequences of his acts. No facts were alleged in support of the allegation. The motion amounted to nothing more than an unsworn and unsubstantiated statement by defense counsel. No evidence was offered to support the motion. "In the absence of any evidence, the mere allegations by counsel that the defendant is incompetent to stand trial do not establish reasonable grounds to doubt the defendant's sanity, and warrant an inquiry into his competency." Cliff v. State, 518 So.2d at 791. On the other hand, the trial court had before it, for its review, a court-ordered mental evaluation from a qualified mental health professional, stating that Ingram did not suffer from any form of mental illness, that he was mentally competent to stand trial, that he understood the nature of the charges, and that he was capable of assisting his counsel in preparing and presenting his defense. We note that no plea of not guilty by reason of mental disease or defect was filed in this case, and Ingram's mental condition was not an issue in the trial of the case. Ingram presented no evidence that would have warranted further inquiry into his mental state. Accordingly, we find no abuse of the trial court's discretion in its denial of Ingram's motion.
Ingram's contention that the trial court erred in holding hearings on his motion in open court and in ordering that copies of the preliminary report of his mental examination be delivered to the court and to the prosecutor is without merit. The procedure followed by the trial court in this case was proper and reasonably necessary for screening the request for a court-ordered mental examination. We note that Ingram did not object to the procedure, but that he, in fact, agreed to it. Ingram's contentions that the trial court erred in failing to provide him with a licensed psychologist or psychiatrist to conduct the mental examination and the failure to hold a jury trial on the question of his competency to stand trial are, likewise, without merit. The provisions of Rule 11.2, Ala.R.Crim.P., concerning a jury trial to determine competency to stand trial, and Rule 11.3 concerning appointment of experts such as psychologists and psychiatrists do not become operative until the trial court has reasonable grounds to doubt a defendant's sanity. Once evidence exists to doubt the defendant's competency to stand trial, the procedure in Rule 11.2 through 11.8 should be followed. Here there was no such evidence. Thus, further inquiry into Ingram's mental state was unwarranted.
Further, we find that the procedure followed by the trial court did not deprive Ingram of any constitutional right, and it complied with Alabama law. And, further, his assertion that the procedure rendered his trial and sentencing fundamentally unfair is unsupported by the record and without merit. Ingram's contentions that the *1272 trial court erred in holding hearings on his motion in open court, ordering that the preliminary report be delivered to the court and prosecutor, failing to provide him with a licensed psychologist or psychiatrist, and failing to provide him with a jury trial on the question of his competency to stand trial, are, under the facts of this case, without merit.

XIV.
Ingram contends that "[t]he continued reading of the indictment along with the name of the foreperson who signed it was error, particularly where that foreperson appears to have been a relative of a sitting juror." No objection was made at trial to the reading of the indictment.
The record shows that the trial court read both counts of the indictment to the entire jury venire before the jury selection process began, obviously to inform the venirepersons of the nature of the case. In reading the indictment, it noted that it had been signed by the district attorney, Robert Rumsey. After the jury was selected and sworn, the trial court again read both counts of the indictment to the jury and noted that it had been signed by the district attorney, Robert Rumsey, and the foreperson of the grand jury, Ruby Mae Garrett. An assistant district attorney read both counts of the indictment in his opening statement to the trial jury, and noted that the district attorney and foreperson Garrett had signed it. Before reading the indictment, the assistant district attorney informed the jury that the indictment was not evidence in the case and that it should not be considered as such. During closing arguments, an assistant district attorney read count one of the indictment to the jury and noted that the district attorney and foreperson Garrett had signed the indictment. At that point, count two had been withdrawn. After reading the indictment, the assistant district attorney again advised the jury that the indictment was only an accusation against Ingram and that it should not be considered as evidence against him. In charging the jury in the guilt phase of the trial, the trial court read count one of the indictment to the jury and noted that the district attorney and foreperson Garrett had signed it. Before reading the indictment, the trial court stated to the jury as follows:
"Cases of this nature come into court before a jury such as yourself by reason of a Grand Jury Indictment. The indictment is not evidence in the case. It does not create any presumption against the defendant, nor permit any inference of guilt; nor is it evidence in this particular case. It should not be considered by you as a circumstance against this defendant. It is just the way that a case of this nature is brought on for trial before a jury such as yourselves."
(R. 906.)
Initially, we point out that Ingram's assertion that the foreperson, Ruby Mae Garrett, "appears to have been a relative" or "may have been a relative" of Ruth Garrett, who served on the trial jury, is pure speculation and based solely on the fact that they share the same surname. His assertion in this regard is a conclusion that has no support in the record.
In Wiggins v. State, 347 So.2d 543, 545 (Ala.Crim.App.1977), we stated:
"The jury must be fairly appraised of the nature of the charges against the accused. While this does not require a reading of the indictment to the jury, the fact that a prosecutor does so is not improper or prejudicial to the appellant especially where the jury is instructed that the indictment is not evidence against the defendant."
See also Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997); Boyd v. State.
In the instant case, the jury was amply instructed that an indictment is not an indication of guilt, but rather a vehicle for bringing an individual to trial. It is clear *1273 from the record that the trial court and the prosecutor were merely reading the indictment to the jury in a good faith effort to inform it of the nature of the charges, and the signatures on the indictment were read as portions of the indictment and statements of fact. We find nothing in the reading of the indictment that would indicate an attempt to bolster the state's case, to degrade Ingram in the eyes of the jury, to impress the jury so as to lend credibility to the charges, or to prejudice Ingram in any way. Here, we find no difference or distinction between the trial court's and the prosecutor's reading of the indictment, and in this particular case, we do not find the number of times that it was read, or the manner in which it was read, to be significant. We find no error or impropriety in the prosecutor and the trial court reading the indictment to the jury under the facts and circumstances of this case. Certainly, there was no plain error.

XV.
Ingram contends that photographs of the victim's body and the crime scene were erroneously admitted into evidence because, he argues, they were "gory" and "cumulative," and were introduced for the sole purpose of inflaming the jurors against him. He asserts that the admission of the photographs violated his constitutional right to a fair trial.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984)."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Kuenzel v. State; Ivery v. State; C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (5th ed.1996).
We have examined the photographs introduced into evidence in this case, and applying the legal principles set out above to the facts of this case, we conclude that the trial court did not abuse its discretion in admitting the photographs into evidence at either the guilt phase or the sentencing phase of the trial. We addressed this identical issue in the companion case of Boyd v. State, 715 So.2d at 832-33, and reached the same conclusion.

XVI.
Ingram contends that the trial court erred in denying his motion for a change of venue based on alleged pretrial publicity. He argues that because the extent of the publicity, exacerbated by the nature of the crime, the publicity, and the fact that a codefendant had been sentenced to death immediately before his trial necessitated such a change in order to enable him to receive a fair trial. Ingram *1274 filed a pretrial motion for a change of venue, alleging that the newspapers, television, and radio stations in the county had published and broadcast extensive and highly prejudicial material concerning him and his case. It does not appear that an evidentiary hearing was held on the motion or that any evidence was offered to support the conclusory allegations made in the motion. It does not appear from the record that the motion was ruled upon by the trial court.
Media publicity can prejudice prospective jurors and thereby result in a denial of an accused's right to an impartial jury. Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), the Alabama Supreme Court held:
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for a change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Thus, `the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App. 1978)."
See also Boyd v. State; Campbell v. State, 718 So.2d 123 (Ala.Crim.App.1997), cert. denied, 525 U.S. 1006, 119 S.Ct. 522, 142 L.Ed.2d 433 (1998).
During jury selection, the voir dire was conducted in four panels, each panel containing 13 venirepersons. Of the 52 potential jurors on the venire, 25 stated that they had read or heard about the case. Of these 25, only 1 stated that he could not put aside what he had read or heard and render a verdict based solely on the evidence presented at trial. Ingram challenged this venireperson for cause and he was excused. The remaining 24 venirepersons indicated that they could put aside what they had read or heard and render a verdict based solely on the evidence presented at trial.
In any criminal case prosecuted by indictment in which a jury is demanded, a defendant shall be entitled to a change of venue to the nearest county free from prejudice if a fair and impartial trial and an unbiased verdict cannot be had in the original county for any reason, and the defendant has the burden of showing to the reasonable satisfaction of the court that a fair trial cannot be reasonably expected in the county in which the defendant is scheduled to be tried. Rule 10.1, Ala.R.Crim.P. Whether a motion for a change of venue should be granted is a *1275 matter addressed to the sound discretion of the trial court. Mathis v. State, 280 Ala. 16, 189 So.2d 564 (1966), cert. denied, 386 U.S. 935, 87 S.Ct. 963, 17 L.Ed.2d 807 (1967).
Although Ingram contends that a review of the record of the voir dire examination shows that he was actually prejudiced by the pretrial publicity, we find that the record does not support his contention. The voir dire shows that the venire from which the jury was selected was not prejudiced against Ingram. In addition, the record does not support a conclusion that the community was saturated with prejudicial publicity. Ingram failed to meet his burden in establishing grounds for a change of venue, and the trial court did not abuse its discretion in denying such a motion, if indeed, it did so.

XVII.
Ingram contends that the trial court engaged in improper commentary and actions that denigrated his case in the jury's eyes and hampered his ability to present a defense. He argues that the trial court "made a number of comments throughout the case" that prejudiced his ability to secure a fair trial. He specifically refers to four comments. He did not object to these comments in the trial court; thus, we review these contentions under the plain-error standard.
First, he contends that error occurred when the trial court gave the jurors the impression that it was "hurrying the case along" so as not to inconvenience them. Second, he contends that error occurred when the trial court rushed his defense by refusing to grant him a continuance so that his mother could testify in person. Third, error occurred when the trial court limited his time for closing argument. Fourth, error occurred when the trial court allegedly made a prejudicial remark about the state's expert witnesses' establishing a proper chain of custody. We have carefully reviewed the record in reference to these contentions, and we do not agree with Ingram's conclusions. The record simply does not support these allegations, and further discussion of them in this opinion is unwarranted. None of the trial court's remarks were prejudicial, rendered his trial fundamentally unfair, or hampered his ability to present a defense. We find no error here, and certainly no plain error.

XVIII.
Ingram contends that the state violated his constitutional right to a "reliable and rational sentence" and his right against being placed in double jeopardy, by it using the underlying kidnapping as an element of the capital offense, and as an aggravating circumstance at sentencing. He did not object to this procedure in the trial court. The practice of permitting the use of an element of the underlying crime as an aggravating circumstance in capital cases is commonly referred to as "doublecounting" or "overlap" and has been held to be constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Coral v. State.
Our statutes allow "double-counting" or "overlap" and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and -50. "The fact that a particular capital offense as defined in § 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." § 13A-5-50.
In this case, the aggravating circumstance that the capital offense was committed while Ingram was engaged in the commission of a kidnapping in the first degree, *1276 § 13A-5-49(4), was established, as a matter of law, by his conviction of the capital crime of murder committed during a kidnapping in the first degree. § 13A-5-40(a)(1).
The use of an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49 does not, as Ingram contends, punish him twice for the same offense, nor does it deny him his right to be protected against double jeopardy. Kuenzel v. State; Burton v. State, 651 So.2d 641 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); Boyd v. State. Likewise, such use does not deny him his right to a reliable and rational sentence. Thus, we find no merit in Ingram's contentions.

XIX.
Ingram contends that references in the trial court's oral charge to the jury in the sentencing phase to the jury's verdict being a recommendation diminished the importance of the jury's role in his sentencing to such an extent that it violated the rule of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). He points to several instances in the trial court's oral charge where the court used the word "recommendation" when referring to the jury's verdict. He argues that this, in effect, "told the jury that its decision would not be a determining factor in sentencing Mr. Ingram to death." (Appellant's brief, p. 55.) He relies on Ex parte Williams, 556 So.2d 744 (Ala.1987), cert. denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991), and Mann v. Dugger, 844 F.2d 1446 (11th Cir. 1988), to support his contention. He did not object to the trial court's instruction to the jury in this regard during the trial of the case.
Caldwell v. Mississippi held that it is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere. However, it is not error for the trial court to accurately instruct the jury as to its role in the sentencing process. See, e.g., Ex parte Hays, 518 So.2d 768 (Ala.1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988); Williams v. State. Comments that accurately explain the respective functions of the judge and jury are permissible under Caldwell so long as the significance of the jury's recommendation is adequately stressed. Harich v. Wainwright, 813 F.2d 1082 (11th Cir.1987); Price v. State, 725 So.2d 1003 (Ala.Crim. App.1997). When a trial court informs a jury that its verdict is advisory or is only a recommendation and that the trial court makes the final decision concerning sentencing, there is no automatic violation of the rule of Caldwell v. Mississippi. Kuenzel v. State; White v. State, 587 So.2d 1218 (Ala.Crim.App.1990), aff'd, 587 So.2d 1236 (Ala.1991); Martin v. State.
In the present case, we do not agree with Ingram's characterizations of the trial court's use of the word "recommendation" in referring to the jury's verdict in the sentencing phase as having the effect of telling the jury that its decision would not be a determining factor. We find, after reviewing the entire charge, that it was a correct statement of the law; that it accurately informed the jury of its sentencing authority; that there is no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing; and that the charge in no way minimized the jury's role and responsibility in sentencing. We find no violation of Caldwell v. Mississippi, as Ingram contends. The cases of Ex parte Williams and Mann v. Dugger, relied upon by Ingram, are factually distinguishable from the instant case.

XX.
Ingram contends that the "heinous, atrocious or cruel aggravating circumstance is unconstitutionally vague and *1277 overbroad and was improperly instructed and applied in [his] case." He argues that the trial court's jury instructions on this aggravating circumstance "failed to channel and limit the sentencer's discretion sufficiently to minimize the risk of wholly arbitrary and capricious action." (Appellant's brief, p. 57.) Although he does not specifically assert that the evidence was insufficient to support a finding of the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance, he raises that issue by implication, and we will, therefore, address it. He did not object to the trial court's instructions to the jury or to the trial court's findings as to this aggravating circumstance at trial; thus, we review this contention under the plain-error standard.
The aggravating circumstance under consideration here is set out in § 13A-5-49(8), as follows: "The capital offense was especially heinous, atrocious or cruel compared to other capital offenses."
To the extent that Ingram is claiming that the "especially heinous, atrocious or cruel" statutory aggravating circumstance found in § 13A-5-49(8), is unconstitutionally vague and overbroad on its face, that contention is without merit. See Freeman v. State, 776 So.2d 160 (Ala.Crim.App. 1999); Bui v. State, 551 So.2d 1094 (Ala. Crim.App.1988), aff'd, 551 So.2d 1125 (Ala. 1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
In comparing capital offenses for the purpose of determining whether a particular capital offense was "especially heinous, atrocious or cruel," we adhere to the standard announced in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)the particular offense must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
In the instant case, the trial court correctly instructed the jury on the meaning of the aggravating circumstance set out in § 13A-5-49(8), in accordance with the Kyzer standard, as well as the burden of proof required of the state in proving aggravating circumstances, as follows:
"On the list of aggravating circumstances provided by law there are two circumstances that you may consider in this case if you are convinced beyond a reasonable doubt and to a moral certainty based on the evidence that each circumstance does exist....
". . . .
"Whether any aggravating circumstance, which I instruct you on or define for you, has been proved beyond a reasonable doubt based on the evidence in this case, is for you the jury alone to determine ...
". . . .
"Now the other aggravating circumstance you may consider is number eight on that list of eight, and that is that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
"The term `heinous' means extremely wicked or shockingly evil. The term `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.
"What is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set this crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense.
"For a capital offense to be especially cruel, it must be a conscienceless or *1278 pitiless crime which is unnecessarily torturous to the victim.
"All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness, or cruelty exceed[s] that which will always exist when a capital offense is committed.
"As I stated to you before, the burden of proof is on the state to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case.
". . . .
"In deciding whether the state has proven beyond a reasonable doubt the existence of any given aggravating circumstance, you should bear in mind the definition I have given you relative to reasonable doubt."
(R. 1031-34.)
We note that we have previously approved of this instruction or instructions that were essentially the same pertaining to the aggravating circumstance of "especially heinous, atrocious or cruel" in a number of cases. Freeman v. State, and cases cited therein.
To the extent that Ingram is claiming that this statutory aggravating circumstance was unconstitutionally applied in his case, that contention is without merit. We find no merit in Ingram's contention that the trial court's instructions to the jury on this aggravating circumstance failed to properly channel and limit the jury's discretion. The trial court's findings, along with its instructions to the jury with regard to this aggravating circumstance, reflect a correct understanding of the aggravating circumstance, and the application of the law relating to it. The instructions were in accordance with the Kyzer standard, and were clear and understandable. See Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989); Ex parte Clark, 728 So.2d 1126 (Ala.1998).
In determining the sentence to impose pursuant to § 13A-5-47, the trial court found the existence of the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. The trial court's findings in this regard are fully supported by the record, and we concur in them. We find no merit to Ingram's assertion that the trial court erred and violated his constitutional rights by the manner in which it found and applied the aggravating circumstance in this case. It is apparent that the trial court, in weighing the evidence presented, was guided by the Kyzer standard. We further find that the evidence was sufficient beyond a reasonable doubt to find the existence of this aggravating circumstance. Ingram's conduct was clearly conscienceless, pitiless, and unnecessarily torturous to the victim. Considering what the victim must have gone through in this case, it would be difficult to imagine a more painful, agonizing, prolonged, and torturous death. We find no merit in Ingram's contention, and certainly no plain error.

XXI.
Ingram contends that Alabama's method of carrying out a death sentence by electrocution constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments and that it should be declared unconstitutional. This contention has been raised numerous times in prior cases and has been consistently rejected.
The death penalty is not per se cruel and unusual punishment prohibited by the Eight Amendment. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Sullivan v. Dugger, 721 F.2d 719 (11th Cir.1983); Ex parte Harrell, 470 So.2d 1309 (Ala.1985); Wright v. State, 494 So.2d 726 (Ala.Crim.App. 1985), aff'd, 494 So.2d 745 (Ala.1986), cert. *1279 denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987).
In support of his contention that Alabama's method of carrying out executions using its electric chair does not meet constitutional standards, Ingram argues that the state uses inadequate equipment, unqualified personnel, and inadequate procedures, all of which result in excessive burning and mutilation of condemned persons and renders death by electrocution in Alabama unpredictable, torturous, and inhumane. He calls our attention to the executions of two previous inmates, Horace Dunkins and Michael Lindsay. This precise legal and factual issue has been previously raised and decided adversely to Ingram. Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala.1983), aff'd in relevant part, 726 F.2d 1505 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); Jackson v. State, 516 So.2d 726 (Ala.Crim.App.1985); Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); McNair v. State, 706 So.2d 828 (Ala.Crim. App.1997).
Ingram did not raise this issue in the court below and has presented no evidence to support his contention. Thus, we find no reason to reconsider our previous holdings on this issue. We find no merit in this contention.

XXII.
Ingram contends that the portion of the Alabama statute, § 15-12-21(d), limiting court-appointed attorneys' fees to $1,000 for out-of-court work for each phase of a capital trial is unconstitutional because, he says, it violates the Due Process Clause and the Equal Protection Clause of the federal and state constitutions, it amounts to an unconstitutional taking of property without due process of law, it violates the doctrine of separation of powers, and it deprives indigent capital defendants of their constitutional right to effective assistance of counsel. These contentions were not raised in the trial court.
The Alabama Supreme Court, as well as this court, has addressed these same contentions in a number of previous cases and has consistently rejected them. See, e.g., Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985) (holding that Alabama's system for compensating appointed attorneys does not violate principles of due process or equal protection or a defendant's Sixth Amendment right to effective assistance of counsel); Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979) (holding that the system does not constitute an unlawful taking of property in violation of the Fifth Amendment, and does not violate the doctrine of separation of powers). See also Smith v. State, 581 So.2d 497 (Ala.Crim.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); Ex parte May, 672 So.2d 1310 (Ala.1995); Boyd v. State.
No facts or data are shown in the record to support any of Ingram's contentions. Thus, we find no basis to warrant a reexamination of our prior holdings on these issues.
The record reflects that Ingram has been ably represented at trial and on appeal by experienced counsel. It does not indicate in any way that counsel's efforts were deterred or diminished by the fees and expenses allowed by the statute. We find no merit in any of the contentions raised, and certainly no plain error.

XXIII.
Ingram contends that his constitutional rights were violated by the state's failure to provide him a full and complete transcript and record of his trial for his use on appeal and our use in reviewing the record for plain error. Although he has the same counsel on appeal that represented him at trial, he does not specifically identify what he contends is *1280 missing from the record. He states in his brief that, "[I]t would appear that some parts of the proceedings may yet be missing." He also states, "It would also appear that at least one legal conference midstream was not transcribed in full." (Appellant's brief, p. 63.) He identifies this legal conference as having taken place on May 17, 1995, outside the presence of the jury and shown on pages 440-41 of the record.
After his trial, Ingram filed a motion in this court pursuant to Rule 10(g), Ala. R.App.P., on October 20, 1995, requesting a complete record; that motion was granted.[9] He did not specify in his motion what he thought was missing from the record, but only compared hearing dates referred to in the case action summary with the transcript in an effort to establish that some pretrial hearings on motions were not transcribed. In response to the motion to supplement the record, the court reporter prepared, and the clerk of the trial court filed, a supplemental record, which we have received and reviewed. Along with the filing of the supplemental record, the court reporter filed a letter addressed to this court, which states as follows:
"Today I received a copy of the Motion to Complete the Record filed in the above-styled cause. In checking my notes, I found a continuance of any motions on April 3, 1995. The only other thing I found was May 19 where there was a short proceeding in which judge gave the attorneys permission to take a witness's deposition. Both of these short proceedings together were a total of ten pages. I have this date filed same with the circuit clerk. I found nothing on the other dates except April 21, and that was already included in the transcript."
(S.R., Oct. 27, 1995, p. 2.)
Appellate review of a defendant's conviction for a capital offense and sentence of death is automatic. §§ 13A-5-54 and -55. The standard for review in death penalty cases is stricter than that in other criminal cases. Harris v. State, 552 So.2d 857 (Ala.Crim.App.1987). Our review in death penalty cases is governed by the plain-error doctrine, which imposes on us the duty to examine the entire record to determine whether any error prejudicial to Ingram exists. Rule 45A, Ala.R.App.P. Because of the statutory requirement of an automatic appeal in death penalty cases, the requirement that we search the record for plain error in such cases, the right to appeal, and because of an appellant's indigency, the state must afford such an appellant a record of sufficient completeness to permit review for plain error and to permit proper consideration of claims presented on appeal. Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963); Harris v. State; Hammond v. State, 665 So.2d 968 (Ala.Crim.App.1994). As we previously noted, Ingram was represented by the same counsel at trial and on appeal. Even where appellate counsel is different from trial counsel, appellate courts do not follow a "mechanistic approach" and automatically reverse a conviction because the transcript or record is less than complete. Ex parte Godbolt, 546 So.2d 991 (Ala.1987); Mosley v. State, 461 So.2d 34 (Ala.Crim.App.1984); Ex parte Harris, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
Where the transcript or record is incomplete, two rules have evolved. The first applies to the situation where the appellant is represented on appeal by the same counsel that represented him at trial. In that case, the failure to supply a complete record is not error per se and will not work a reversal absent a specific showing of prejudice. In other words, in such a case, the appellant must show that failure *1281 to record and preserve the specific portion of the trial proceedings complained of visits a hardship upon him and prejudices his appeal. The second applies to the situation where the appellant is represented by new counsel on appeal. When he is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to warrant reversal. Ex parte Godbolt, adopting the rule established in United States v. Selva, 559 F.2d 1303 (5th Cir.1977). "We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript." Ex parte Godbolt, 546 So.2d at 997, quoting with approval, United States v. Selva, 559 F.2d at 1305-06.
Here, Ingram fails to allege or even speculate on what he contends is missing from the transcript or record. He says only that something may be missing. From our review of the record and transcript, they appear to be complete. He has clearly failed to meet his burden of showing that there has been a failure to record and preserve a substantial and significant portion of the record and that, as a result, he has suffered hardship and prejudice. From our review, and given the particular facts of this case, we conclude that if there were any untranscribed portions of the proceedings, they did not constitute a substantial and significant portion of the record, they could have had no effect on the outcome of this appeal, and they could not have affected any of Ingram's substantial rights. We further conclude, under the facts of this case, if there were any error in failing to ensure that the entire proceedings were transcribed, such error in this case would be harmless.

XXIV.
Ingram contends that the cumulative effect of the alleged errors enumerated in his brief to this court violated his rights to due process and to a fair trial under the United States and Alabama constitutions. We do not agree. We have reviewed each and every allegation of error and have found no reversible error. We have also reviewed all of his alleged errors collectively, and still find no reversible error or violation of Ingram's rights.

XXV.
In accordance with Ala.R.App.P. 45A, we have examined the record for any plain error, whether or not brought to our attention or the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentence phases of the trial.
We have also reviewed Ingram's sentence in accordance with the provisions of § 13A-5-53. Section 13A-5-53(a) requires that, in addition to reviewing the case for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by us of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
*1282 After the jury convicted Ingram of the capital offense charged in count one of the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury returned the following verdict: "We the jury recommend that the defendant, Robert Shawn Ingram, be punished by death, eleven for death, one for life imprisonment without parole." (R. 1048.)
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to aid it in determining whether it would sentence Ingram to death as recommended by the jury or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any mitigating circumstance found to exist under § 13A-5-52, as well as written findings of fact summarizing the crime and Ingram's participation in it.
In its findings of fact, the trial court found the existence of the following aggravating circumstances: (1) "The capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit a kidnapping." (R. 53.) § 13A-5-49(4), and (2) "The capital offense was especially heinous, atrocious or cruel, compared to other capital offenses." (R. 53.) § 13A-5-49(8). The trial court examined the evidence for statutory and nonstatutory mitigating circumstances, pursuant to the requirements of §§ 13A-5-51 and -52, and found the existence of one statutory mitigating circumstance, i.e., "The defendant has no significant history of prior criminal activity." (R. 54.) § 13A-5-51(1). The court found that no other mitigating circumstances existed, either statutory or nonstatutory. In its findings, the trial court stated:
"The court has made a diligent search under the provisions of Section 13A-5-52, the evidence offered by the defendant, and aspects of the presentence report favorable to the defendant on mitigation to determine if there is any aspect of the defendant's character or record or any circumstance of the offense for which he has been convicted that would constitute a mitigating circumstance and finds that there is one mitigating circumstance as set out above [(no significant history of prior criminal activity, § 13A-5-51(1)) ], but finds no other, statutory or nonstatutory."
(R. 55.)
The trial court considered all of the evidence presented, the presentence report, and the advisory verdict of the jury, weighed the aggravating circumstances against the mitigating circumstance, and sentenced Ingram to death. In weighing the aggravating circumstances against the mitigating circumstance, the trial court found, in pertinent part, the following:
"In considering the aggravating circumstances as heretofore set forth and enumerated under Section 13A-5-49(4) and (8), the presentence investigation report, the absence of mitigating circumstances, statutory or nonstatutory, except as hereinabove enumerated, the facts of the case at hand, the evidence offered by the defendant and the jury's recommendation of the death sentence, the Court finds that there is only one logical conclusion as to the defendant's punishment. That conclusion being that he *1283 should suffer the punishment of death by electrocution as provided by law."
(R. 55-56.)
"The Court finds that the conduct of the defendant constituted a brutal, aggravated, merciless and intentional killing of a man, and the recommendation of the jury as to punishment to be imposed was fully justified by the facts and circumstances of the case and the aggravating circumstances outweighed the mitigating circumstance proved by the defendant."
(R. 50-51.)
Ingram was convicted of the offense of murder committed during a kidnapping in the first degree, a capital offense under Alabama law. § 13A-5-40(a)(1). We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996); Musgrove v. State; Heath v. State, 455 So.2d 898 (Ala.Crim.App.1983), aff'd, 455 So.2d 905 (Ala.1984), aff'd, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); Callahan v. State, 557 So.2d 1292 (Ala.Crim.App.), aff'd, 557 So.2d 1311 (Ala.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990).
After carefully reviewing the record of the guilt and the sentence phases of appellant's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We concur in the recommendation of the jury and in the judgment of the trial court that death is the appropriate sentence in this case. Our independent weighing of the aggravating circumstances against the mitigating circumstance convinces us that the sentence of death is appropriate in relation to this defendant. Considering the crime committed and the defendant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, Ingram's convictions and the sentence of death are due to be, and they are hereby, affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors. The decision to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors. Code of Alabama 1975, § 13A-5-46(b).
[2] While the jury's recommendation concerning the sentence shall be given consideration, it is not binding upon the trial court. § 13A-5-47(e).
[3] In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term "plain error" adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that "has or probably has adversely affected a substantial right of the appellant," Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
[4] Anthony Boyd was indicted and convicted of the same capital offense and was sentenced to death. His conviction and sentence were affirmed by this court and the Alabama Supreme Court. Boyd v. State, 715 So.2d 825 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
[5] Moneek Marcell Ackles was indicted and convicted of the same capital offense and was sentenced to life imprisonment without the possibility of parole. His conviction and sentence were affirmed by this court by unpublished memorandum on August 23, 1996. Ackles v. State, 689 So.2d 1010 (Ala.Crim.App. 1996).
[6] Dwinaune Quintay Cox pleaded guilty to murder, pursuant to a plea bargain agreement in which he agreed to testify, and was sentenced to life imprisonment. He did not appeal.
[7] The United States Supreme Court extended its decision in Batson to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to civil cases in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); and to defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Recently the Alabama Supreme Court held that Batson applies to the striking of prospective white jurors. White Consol. Indus., Inc. v. American Liberty Ins. Co., 617 So.2d 657 (Ala.1993). In 1994, the United States Supreme Court extended Batson to gender-based strikes in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
[8] The victim's hands were removed from his body by Dr. Embry, the state's medical examiner, so that they could be subjected to fingerprinting tests.
[9] We note that a second motion to supplement the record was filed by Ingram on January 4, 1996, requesting a copy of the jury venire and strike list in the case. A supplemental record was filed that included these items on January 4, 1996.